John CHAPMAN, Appellant,

v.

BEAVER DAM COAL COMPANY et al.,
Appellees.

Court of Appeals of Kentucky.

June 12, 1959.

Rehearing Denied Oct. 9, 1959.

Woodward, Hobson & Fulton, Ernest Woodward, Louisville, for appellant.

Bullitt, Dawson & Tarrant, Charles I. Dawson, Thomas S. Dawson, Louisville, Martin & Martin, Otto C. Martin, Earl F. Martin, Hartford, for appellees.

STEWART, Judge.

In this action plaintiff, John Chapman, sought damages in the amount of $10,000 from defendants, Beaver Dam Coal Company (the lessor) and Riverview Coal Company (the lessee) for an alleged trespass on his property. In the alternative, he claimed he should be granted a permanent injunction compelling defendants to cease discharging deleterious mine refuse upon his land, if proof of damage to his property could not be established with certainty. We shall herein refer to the above parties as "Chapman", "Beaver Dam" and "Riverview".

The case was heard by the trial judge without a jury who delivered opinions, holding first that Beaver Dam, the lessor, was not liable, and finding next that Chapman was not entitled to any recovery against Riverview, the lessee. Judgment was then entered dismissing the complaint.

Chapman has appealed, raising these issues: Is Riverview responsible for dam-

ages to Chapman as a consequence of water flowing from Riverview's mine workings through and over Chapman's land which contained injurious substances? If Riverview is liable, then is Beaver Dam jointly answerable with Riverview for whatever damage the latter has done to Chapman's land? It is our view the lower court correctly determined both of the questions presented in this appeal. We also believe, under the proof, the trial court properly refused to grant injunctive relief.

Chapman is the owner of a farm in Ohio County of approximately 306 acres, 80 or 100 acres of which is low flat land and the remainder of which lies on parallel ridges. The ridges range along the east and the west sides of the farm, and enclose the low flat land from its northern to its southern boundary. A fork of Southard's Creek, referred to in the evidence as "the middle fork", runs from north to south dividing Chapman's farm into two almost equal parts. The channel of this fork is approximately eight feet wide, four or five feet deep and, according to Chapman, one mile long. It is the natural, and only, outlet for the flow of water from the land situated immediately north of Chapman's farm.

Beaver Dam owns the coal and other minerals, including the right to mine the same, on a 1,600-acre tract lying north of and adjoining Chapman's farm. Riverview under a 10-year lease operates a strip mine on the premises. The drainage from Riverview's mining works empties into the middle fork and flows through it across Chapman's land. In addition to the northern watershed, the fork also receives the entire drainage from the two ridges paralleling the creek on the east and west. The lower court stated it was safe to assume the water discharged into the creek from Riverview's project on the north is comparatively small in relation to the entire watershed. Except when rains are heavy the flow of water from Riverview's mine is small. During heavy rains the creek floods, and the water from the mine, containing mostly copperas, mixes with the water from the entire watershed.

In the instant case, Chapman agrees that natural surface water may pass from Riverview's leased premises over his land through the middle fork without imposing liability, but insists that Riverview has no right to place refuse and copperas into water that flows into the middle fork by way of its "bleeder" ditch. Riverview describes its bleeder ditch as being about four inches wide and one-half inch deep, carrying water from the foot of one of the mine working's spoil banks. According to tests conducted by Riverview, and introduced by it in evidence, the water from the bleeder ditch when commingled with that of the middle fork amounts to less than 5% of the total flow in the middle ditch.

Chapman contends it is not the size of the poisonous discharge that counts, but the fact that there *is* such a discharge. He asserts that only a few acres from over one vein of coal have been stripped and that eventually 1,600 acres over three veins will be stripped, with the result that almost one thousand times as much harmful water will be discharged over his land as is now passing over it. At the present time, however, the proof established that Riverview is merely permitting the water from its open workings to empty into the middle ditch, which is the natural drainage route from the entire watershed on which the mine is located.

As we have pointed out, any overflow from the middle ditch is caused solely by heavy rainfall. It would appear Riverview should not be held accountable for the flow of refuse water from its workings unless there is clear proof that such a quantity of poisonous substances is discharged into the middle ditch as to cause evident damage to Chapman's land when the middle ditch overflows. In that event Riverview would be liable not as a trespasser, but solely upon the theory that in exercising its right to carry its water through Chapman's land it has done so in such a manner as to damage him.

It is of prime importance, therefore, to determine in what degree, if any, Chapman's farm is sustaining, or has sustained, an injury by the existence of copperas or other poison in the water of the middle fork of Southard's Creek. The evidence of expert witnesses on this precise point is conflicting. They agree, however, on the use of the "Ph test" to determine the degree of acidity or alkalinity of soil and water. If the Ph test shows 7.0 the soil or water is neutral; if the Ph test is below 7.0 the soil or water is acid. As the test of the soil or water reveals a descending scale it denotes increasing acidity; agricultural crops will not grow if the test discloses 3.8 or below. If the soil or water rates above 7.0, it is alkaline.

Chapman pins much of his case on the testimony of Ernest M. Spokes, an assistant professor of mining engineering at the University of Kentucky, who has been engaged in research on steam pollution since 1950. Spokes tested water samples from the bleeder ditch and made water tests north of Chapman's land. These measurements showed a high degree of acidity and he concluded the deleterious water being discharged into the middle fork would in the indefinite future destroy Chapman's bottom land. He took no specimen from the water of the middle ditch itself or from the soil on the banks of the ditch. Another expert witness, R. D. Ridley, the county agricultural agent of Ohio County, testifying for Chapman, stated he examined some soil samples and agreed as to the ultimate destructive effect of the contaminated water but was unable to make any evaluation of present damage to Chapman's land.

Riverview introduced four expert witnesses: John Crowl, a graduate of the Utah State Agriculture College, with twenty-one years' experience in soil and water conservation, who is now employed by the Kentucky Reclamation Association (composed of strip mining coal operators); Francis W. Collins, an assistant to Crowl and a graduate of the University of Ken-tucky; James A. Dean, a reclamation engineer for Sinclair Coal Company and a graduate of Purdue University; and Maurice Miller, who studied at the University of Louisville and Overland College, and who has had thirty-seven years' experience in soil and water reaction. These witnesses made examinations of the soil and water on the territory involved in this case. They tested the water in the branches leading from the mine workings and the water in the middle ditch. These measurements showed a Ph rate of 5.5 to 7 plus. Similar examinations were made of the soil in Chapman's bottom land, which disclosed a Ph test of from 4.5 to 5.0. Soil tests made of the spoil banks revealed a Ph indication from 5.5 to 8. These evaluations pointed up that the acid content of the water was lower than that of the land over which it sometimes overflows.

Chapman asserts the lower acidity of the water in the middle ditch as compared to the adjacent land is understandable because copperas constantly seeps from the water into such land. Riverview claims that seepage into the sides of the ditch would be negligible because the ditch is bedded in clay, not sandy, soil. There was proof to the effect that the soil in Ohio County is naturally of high acidity, ranging from 5.5 to 6.5. It is also in the evidence that, for about twenty-five years from 1900, a mine was operated in a seam (No. 9) which was highly impregnated with copperas. Much of this water found a drainage course into the middle fork and through Chapman's land and, yet, his evidence showed his bottom land was very productive immediately before Riverview's operation. In addition to this scientific evidence as to the present condition of the land, Chapman was asked on cross-examination whether he could now detect any evidence of damage to his farm by looking at it, and his answer was a negative one.

█ The rule on the measure of damages where the injury is permanent is the difference in the fair market value of the land

immediately before the trespass and its fair market value immediately thereafter. See City of Hazard v. Eversole, 280 Ky. 621, 133 S.W.2d 906; Kentucky-Ohio Gas Co. v. Bowling, 264 Ky. 470, 95 S.W.2d 1. Chapman's evidence emphasized the market value of the tract under discussion before Riverview's operation was initiated, but there is scant testimony as to its market value subsequent to the mining. A number of neighboring farmers estimated the value of the farm before the stripping had begun at about $150 per acre, the hill land being worth somewhat less than the bottom land; but these witnesses could not state what the land was worth after the mining had commenced. Several commented that it would not be worth much. Suffice it to say, this or any court would have a difficult task, even if there was some evidence of present injurious effect, in fixing the amount of Chapman's damages.'

The possible plight of Chapman is appreciated. The learned circuit judge, in a carefully considered opinion, admitted that "water highly impregnated with copperas, slack and other poisonous matter from a mine will injure land used for agricultural purposes." But the evidence revealed Chapman's farm is still as productive as ever. It cannot be known when and if its productivity will diminish as a result of acts attributable to Riverview. This Court, as well as the lower court, cannot presume a future total destruction when there is no concrete evidence of past or present damage to Chapman's land. In our opinion the evidence introduced in this case was simply inadequate to sustain the allegations of damages. It follows that since an action for damages will not lie against Riverview, as a matter of course none will lie against Beaver Dam.

Furthermore, if there is a lack of proof of past or present damage and no reasonable certainty of future damage, which was shown here, Chapman is not entitled to an injunction prohibiting the discharge by Riverview of water of a deleterious nature from its bleeder ditch into the middle fork. This Court cannot predicate an injunction upon the mere fear that damage may result at some time in the indefinite future. See 28 Am.Jur., Injunctions, sec. 28, p. 221.

Wherefore, the judgment is affirmed.