**ROCKWELL INTERNATIONAL CORPORATION, Appellant,**

v.

**Vance WILHITE and 74 Additional Appellees Named in Notice of Appeal, Appellees.**

**No. 1997–CA–000188–MR.**

Court of Appeals of Kentucky.

Aug. 8, 2003.

Discretionary Review Denied by Supreme Court Aug. 18, 2004.

---

1. *See Shoney's Inc. v. Lewis,* Ky., 875 S.W.2d 514 (1994).

M. Stephen Pitt, Virginia H. Snell, J. Anthony Goebel, Donald J. Kelly, Wyatt, Tarrant & Combs, Louisville, KY, Andrew L. Frey, Evan M. Tager, Charles A. Rothfeld, Mayer, Brown & Platt, Washington, DC, for appellant, Rockwell International Corporation.

James R. Cox, John S. Reed, Reed Weitkamp Schell Cox & Vice, Louisville, KY, for amici curiae, Logan County Economic Development Commission, Inc., Associated Industries of Kentucky and Kentucky Coal Association.

Kent Masterson Brown, Danville, KY, Daniel J. Popeo, Paul D. Kamenar, Washington Legal Foundation, Washington, DC, for amici curiae, Washington Legal Foundation and Allied Educational Foundation.

Charles L. Cunningham, Jr., Charles E. Fell, Jr., Michael McDonald, Louisville, KY, John W. "Don" Barrett, Lexington, MA, W. Patrick Murray, Steven C. Bechtel, Murray & Murray, Sandusky, OH, Thomas M. Jessee, Jessee & Jessee, Johnson City, TN, Gary E. Brewer, Leslie A. Muse, Morristown, TN, Thomas A. Noe, III, Russellville, KY, William Gordon Ball, Knoxville, TN, for appellees.

Before KNOPF and TACKETT, Judges; and HUDDLESTON, Senior Judge.[1]

## OPINION

HUDDLESTON, Senior Judge.

This case, involving alleged injury to the appellee landowners' properties in Logan County, Kentucky, as the result of the deposit thereon of polychlorinated biphenyls (PCBs) by Rockwell International Corporation, is on remand from the Supreme Court. At trial, there were 50 separate awards to the landowners of compensatory damages totaling $7,566,118.00 for 54 tracts of land. Punitive damages in the amount of $210,000,000.00 were awarded to all landowners jointly. We initially reversed the judgment.

Although the Supreme Court affirmed our initial decision[2] that the testimony of the landowners' valuation witness, Charles Snyder,[3] was inadmissible, it went on to say that:

There was other evidence, however, of permanent injury to properties for which landowners may be entitled to compensation, and the proper remedy is to remand to the trial court for a new trial in accordance with the views set forth herein.

Prior to a new trial, however, there are other issues that must be decided by the Court of Appeals. On appeal from the final judgment, Rockwell presented numerous issues, some of which asserted a right to prevail on all claims, while others asserted a right to prevail on the claims of particular landowners. As the Court of Appeals' decision rendered a ruling on these other issues unnecessary, our disposition requires remand to consider the issues raised by Rockwell but left unresolved by the Court of Appeals.

Accordingly, this case is hereby remanded to the Court of Appeals for consideration of the issues presented by Rockwell but not decided in its opinion of January 14, 2000. In the event the Court of Appeals discovers no reversible error in other respects, the case shall be returned to the trial court for a new trial in conformity with this opinion and the subsequent opinion of the Court of Appeals, subject to the right of either party to move for discretionary review in this Court.[4]

1. Senior Judge Joseph R. Huddleston sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Ky.Rev.Stat. (KRS) 21.580.

2. *Rockwell International Corp. v. Wilhite*, Ky. App., No. 1997–CA–000188–MR (Jan. 14, 2000). Although the opinion was ordered published by this Court, it was depublished by the Supreme Court when it accepted discretionary review. For the reader interested in tracing the history of this case, the opinion may be found on-line at 2000 Ky.App. LEXIS 2 and 2000 WL 95282.

3. Snyder testified that the deposit of any quantity of PCBs on the landowners' properties, no matter how minute, rendered the properties worthless. The basis on which we held that Snyder's testimony was inadmissible is set forth in detail in our initial opinion, *id.*

4. *Wilhite v. Rockwell International Corp.*, Ky., 83 S.W.3d 516, 522 (2002).

To comply with the Supreme Court's mandate that we consider the issues raised by Rockwell in its initial appeal which were not decided, we undertake to answer the following questions:

I. What is the applicable statute of limitations and are the landowners' claims barred by that statute?

II. Do the landowners have a valid claim for negligent trespass?

III. Do the landowners have a valid claim based on the creation by Rockwell of a permanent nuisance?

IV. Was the award of punitive damages the result of passion and prejudice? [5]

## I. Statute of Limitations

The first question we must answer on remand is: what limitation period applies on the current facts and, further, how does its application affect the recovery, if any, to which the landowners are entitled? Our analysis begins with a review of the arguments set forth by both the landowners and Rockwell.

According to Rockwell, the landowners "cannot recover because their own evidence showed that there was no decline in the value of their properties within the period of limitations." Further, the landowners "concede that the applicable statute of limitations bars them from recovering for damages occurring more than five years before the action was filed" and, under the landowners' own theory of the case, their land became worthless upon the discovery of a detectable PCB presence which was established prior to 1988.[6] This means that the landowners could not have suffered any further damage within the limitation period because "the proper measure of permanent damage to real estate in Kentucky is the difference in the fair market value of the real estate just before and after the injury." [7] Inasmuch as the landowners offered no evidence to establish the value of their property just before or after the injury, they have, Rockwell contends, "altogether failed to establish an element essential to their claim."

In response, the landowners claim that Rockwell's argument "ignores [Kentucky Revised Statutes] KRS 413.190(2), which tolls the limitations period during the pendency of any concealment by a defendant which frustrates a claim." The jury, the landowners contend, "heard considerable testimony which documented such concealment and affirmative acts designed to mislead the public." The landowners also rely on the circuit court's determination that the discovery rule is applicable in property damage cases, emphasizing that "the claim does not arise in matters such as this until the damage is apparent." [8] The landown-

---

5. The parties have submitted supplemental briefs addressing these issues, and we have had the benefit of an additional oral argument.

6. In a memorandum opinion and order entered on January 22, 1996, the circuit court denied Rockwell's motion to dismiss on the basis of the statute of limitations. In so doing, the circuit court found that persons in the floodplain area were placed on notice regarding PCB contamination as of September 1988, when a final report prepared by Dr. W.J. Birge for the University of Kentucky entitled "Occurrence, Transport and Fate of Contaminants in Kentucky Freshwater Systems—Green River Drainage" was released.

7. *Central Kentucky Drying Co., Inc. v. Department of Housing,* Ky., 858 S.W.2d 165, 167 (1993).

8. In support of this proposition, the landowners cite *Arnett v. Commonwealth, Dept. of Highways,* Ky., 528 S.W.2d 678 (1975), and *Big Sandy & Cumberland R.R. Co. v. Thacker,* 270 Ky. 404, 109 S.W.2d 820 (1937).

 In *Arnett,* property owners alleged that a bridge constructed by the Commonwealth

ers were unaware, they say, that "they had suffered an actionable trespass to their land until sometime after 1988" because, although "the trespass itself may have occurred, at least in part, many years earlier, the occurrence of damage as a result, an essential element of the claim, happened much later." Since PCBs are "invisible to the eye, odorless, and can only be detected through costly testing" and present a "progressive problem," the landowners also contend that "it would be inappropriate to fault [them] for not racing to the courthouse to bring claims they did not even comprehend existed" and, likewise, that their inability to "pick a magical, non-existent date of injury" should not be fatal to the claims asserted.

In its brief on remand, Rockwell reiterates its contention that the landowners' suit is governed by a five-year limitations period, citing KRS 413.120 and *Wimmer v. City of Ft. Thomas*[9] as authority. According to Rockwell, because the landowners characterize the injury to their property as "permanent," the cause of action accrued on the date of the first injury and "everyone agrees that [the landowners'] properties were first exposed to PCBs many more than five years prior to the initiation of this action." In the alternative, Rockwell argues that even if the trespass in question is deemed to have been continuous in nature, as found by the circuit court, the statute of limitations still operates to bar all claims for damages occurring more than five years prior to the date (March 26, 1993) on which the complaint was filed. Thus, the landowners would have to establish the difference in the fair market value of the property "that was inflicted within the limitations period." As the "minimal levels of PCBs" present on their property have not actually adversely impacted its market value, Rockwell asserts that the

across a stream on their property resulted in a diversion of water which ruined their crops and constituted a taking without just compensation. Kentucky's highest court reversed the trial court's dismissal of the action based on the statute of limitations, finding that the "controlling question is not when the bridge was built, but when the damage occurred," and the Arnetts' purchase of the property after construction of the bridge did not deprive them of standing to sue as they would have been entitled to compensation if the Commonwealth was creating a nuisance. 528 S.W.2d at 679.

In *Big Sandy*, the High Court emphasized that the "burden was on the appellant to establish its plea of limitations, and it has failed to show that the injuries here complained of were such that they might reasonably have been anticipated at the time when the structure was completed." The Court went on to say that "a party is not required to sue for damages to his land until it is reasonably apparent that he has suffered damages." 109 S.W.2d at 821.

**9.** Ky.App., 733 S.W.2d 759, 760 (1987).

Rockwell also cites *Fergerson v. Utilities Elkhorn Coal Co.*, Ky., 313 S.W.2d 395 (1958), in support of its position. In *Fergerson*, Ken-

tucky's highest court observed that an action for trespass usually accrues when the trespass is committed, and the statute of limitations begins to run at that time. "These cases ordinarily involve a sudden invasion which is quickly terminated. In other cases where the invasion does not cease immediately and the trespass continues, one may recover damages for the injury inflicted during the five-year period immediately preceding the instigation of the action." *Id.* at 399. Consistent with this reasoning, the Court adopted Dean Prosser's view on the subject:

> The ordinary trespass is complete when it is committed; the cause of action accrues, and the statute of limitations begins to run at that time, although the consequence may be a permanent injury to the land. But in many cases, as where the defendant erects a structure or dumps rubbish upon the land of the plaintiff, the invasion is continued by a failure to remove it. In such a case, there is a continuing wrong so long as the offending object remains. *Id.*, citing Prosser on Torts § 13.

*See also* Prosser and Keeton on The Law of Torts § 13, p. 83 (5th ed.1984).

landowners cannot make the required showing.

The landowners, on the other hand, argue that "Rockwell's hidden misconduct from before 1988 should be considered by the jury when assessing punitive damage issues." In their view, although a cause of action "does not accrue until there has been a manifestation of damage or injury," the "entire panoply of the wrongdoer's conduct is admissible and considered" for the purpose of establishing the elements of the cause of action. According to the landowners, both *District Union Local 227, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO v. Fleischaker*[10] and the more recent case of *Sand Hill Energy, Inc. v. Ford Motor Co.*[11] provide support for this position.

Since the circuit court's finding to that effect has not been challenged, the landowners are charged with having notice regarding PCB contamination as of September 1988. Pursuant to KRS 413.120, their action against Rockwell had to be "commenced within five years after the cause of action accrued," assuming the statute applies. Because the landowners filed their complaint on March 26, 1993, it is beyond dispute that they initiated their action within the designated limitations period.

The inquiry does not end there however. Rather, the question becomes when the cause(s) of action accrued, a determination that necessarily hinges on whether the injury is characterized as permanent or temporary in nature, and the resolution of which dictates when the applicable limitations period began to run thereby defining the extent of the landowners' injury for purposes of recovery.

In *Wimmer*,[12] we observed that Kentucky's highest court had previously held

10. Ky., 384 S.W.2d 68 (1964). In *Fleischaker*, a civil conspiracy case, the High Court said that: "We believe that a conspiracy which contemplates a series of overt acts is a continuing conspiracy and the statute does not commence to run until the last overt act performed in compliance with the objective of the conspiracy has been accomplished." *Id.* at 72. Consistent with this view, the Court concluded that the claim for damages at issue was not barred by KRS 413.140 (which provides that actions for conspiracy shall be commenced within one year after a cause of action accrues) since the last overt act occurred within one year of the filing of the action. *Id.* According to the landowners, this case is analogous to the instant case and "the critical point is that for purposes of assessing punitive damages, the wrongdoer's conduct all the way back to its original onset [is] admissible."

11. Ky., 83 S.W.3d 483 (2002). In *Sand Hill*, the Supreme Court concluded that the degree of reprehensibility of Ford's conduct was "substantial" for purposes of reviewing the punitive damages award, relying on the fact that there was "no doubt that for at least seven years after Ford knew of the dangerous propensities of the C–6 transmission, it continued producing and installing it in its vehicles." *Id.* at 494. As observed by the Court, the vehicle in question "was a 1977 model manufactured five or more years after Ford knew of the dangerous propensity of its transmission." *Id.* The landowners cite *Sand Hill* for the proposition that conduct before the limitations period can be considered in assessing punitive damages under Kentucky law, emphasizing the quoted language as well as references by the Court to documents dating back to 1970 in describing Ford's misconduct. On May 19, 2003, the United States Supreme Court vacated the decision in *Sand Hill* and remanded the action to the Kentucky Supreme Court for further consideration in light of its decision in *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). *State Farm* further clarifies the factors to be considered in assessing punitive damage awards and, in effect, sets an upper limit on punitive damage awards. *Ford Motor Co. v. Estate of Smith*, 538 U.S. 1028, 123 S.Ct. 2072, 155 L.Ed.2d 1056 (2003).

12. *Supra*, n. 9, at 760, *citing Commonwealth, Dept. of Highways v. Ratliff*, Ky., 392 S.W.2d 913 (1965), and KRS 413.120(4).

that actions for damages to real property caused by another's negligence sound in trespass, and the five-year statute of limitations applies to them. Because *Commonwealth, Dept. of Highways v. Ratliff*[13] involved a one-time incident of damage to a highway bridge by a truck and driver, the Supreme Court determined that suit had to be brought during the five-year period following the collision. Since the appellant in *Wimmer* alleged a continuing trespass as a result of the city's negligent failure to maintain its street adjacent to his property, however, we said that "[o]ffending structures causing continuing trespasses and recurring damages are not susceptible to a simplistic application of the five-year limit." In so doing, we applied the following guidelines derived from *Honaker v. Chesapeake & Ohio Railway Co.:*[14]

(1) If the offending structure is permanent and non-negligent, suit must be brought within five years from the date the cause of action accrued;

(2) If the offending structure is permanent but negligently or unlawfully built or maintained, recurring recoveries may be had as the injuries occur;

(3) If the offending structure is temporary, recurring recoveries may be had irrespective of negligence;

(4) If the offending structure is permanent but unlawfully built or negligent, only a one-time recovery brought within five years from the date the cause of action accrued is allowed if it be shown that the structure cannot be remedied at an expense reasonable in relation to the damage;

(5) If the evidence on the question of negligence presents a genuine issue, it is for the jury to decide.[15]

In summary, we reiterated the importance of determining whether a structure is permanent or temporary. A "structure is permanent if it cannot be readily remedied, removed or altered at reasonable expense, or is durable and meant to last indefinitely," while "if the structure can be changed or repaired or remedied at reasonable expense, it is temporary."[16] Citing *Lynn Mining Co. v. Kelly,*[17] we determined that in those instances where the five-year statute of limitations does apply, the date the cause of action accrues is the "date the structure was completed and its operations commenced, or the date of the first injury, or the date it became apparent that injury would occur."[18] Conversely, if the trespass or invasion of the landowners' property is a continuing one, damages are recoverable for the five-year period immediately

13. *Id.*

14. 209 Ky. 576, 273 S.W. 81 (1925).

15. *Wimmer, supra,* n. 9, at 760.

16. *Id.* at 761, *citing Fergerson, supra,* n. 9.

17. Ky., 394 S.W.2d 755 (1965). In *Lynn Mining Co.,* as is the case here, the parties assumed that KRS 413.120 was the governing statute. However, the Court distinguished between permanent and temporary nuisances, observing that the statute would bar the appellees' claims "only if the condition created

by appellants constituted a *permanent nuisance.*" Alternatively, "if the facts established a *temporary nuisance,* this was a continuing trespass for which damages could be recovered for each recurring injury (subject to the limitation that damages could not be recovered for so much of the injury as occurred more than five years before the commencement of the action)." *Id.* at 757 (original emphasis). *See also Judd v. Blakeman,* 175 Ky. 848, 195 S.W. 119 (1917), and *City of Princeton v. Pool,* 171 Ky. 638, 188 S.W. 758 (1916).

18. *Wimmer, supra,* n. 9, at 761.

preceding the instigation of the action.[19]

Regardless of whether the injury to the landowners' property is classified as a permanent or temporary nuisance, *West Kentucky Coal Co. v. Rudd*[20] provides further guidance. That suit was brought by a farm owner against eight coal companies to enjoin the discharge of coal slack, copperas waters and other deleterious substances which were carried into the river and deposited on his farm during overflow periods causing damage to the productivity and fertility of the land. Similar to the characterization of the landowners' claim by Rockwell and its implications, West Kentucky Coal alleged that the farmer had asserted that the value of his farm was completely destroyed as early as 1937 or 1940 and, therefore, any contamination that resulted from its operations in more recent years could not have damaged him further.[21] Observing that this argument was "tied in with a plea of limitations," Kentucky's highest court said that, when taken as a whole, the farmer's pleadings and evidence asserted a claim of continuing partial damage to his farm and did not warrant the interpretation placed on them by the coal company.[22] The Court pointed out that it was the method of operation that constituted the nuisance rather than the mines themselves, which did not constitute permanent nuisances "in the sense of an expensive permanent structure."[23] Relevant for present purposes, the Court engaged in the following analysis of the injury and its implications:

> Nor is the injury to the plaintiff in the category of permanent injury within the rule that the cause of action commences to run at the time the injury first occurs. Injury of the character here involved has many times been held to constitute a continuing trespass, for which damages or an injunction may be obtained at any time, the only limitation being that damages cannot be recovered for so much of the injury as occurred more than five years before commencement of the action.[24]

Although this reasoning together with the aforementioned principles would, at first blush, appear to be dispositive as to the issue presented, the case law summarized thus far must be interpreted in light of the "discovery rule," 42 United States Code (U.S.C.) § 9658[25] in the context of

---

19. *Id.* at 761, *citing Fergerson, supra*, n. 9, at 399.

20. Ky., 328 S.W.2d 156 (1959).

21. *Id.* at 159.

22. *Id.*

23. *Id.* at 160.

24. *Id.*

25. In relevant part, 42 U.S.C. § 9658 (also known as Section 309 of the Comprehensive Environmental Response, Compensation, and Liability Act or CERCLA) provides:

 (a) State statutes of limitations for hazardous substance cases.

 (1) Exception to state statutes. In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

 (b) Definitions. As used in this section—

 (2) Applicable limitations period. The term "applicable limitations period" means the period specified in a statute of limitations during which a civil action referred to in subsection (a)(1) may be brought.

 (3) Commencement date. The term "commencement date" means the date specified in a statute of limitations as the

actions under state law for injury resulting from exposure to hazardous substances.

In *Louisville Trust Co. v. Johns–Manville Products Corp.,*[26] the Supreme Court was confronted with the question of whether to extend the "discovery rule" of medical malpractice cases to tort actions for injuries resulting from latent disease caused by exposure to harmful substances. It could find no "compelling policy-based reason" for distinguishing between the two types of actions for the purpose of determining when an injured party must bring a lawsuit or be barred by limitations. As there was no dispute concerning the operative facts, the Court concluded that an administrator's suit seeking recovery under a theory of products liability arising from an alleged failure to adequately warn of known dangers associated with the inhalation of asbestos dust was timely filed and not barred by the one-year statute of limitations, although the action was brought nearly five years after the decedent had voluntarily terminated his employment with Johns–Manville.[27]

In extending the rule's application, the Court relied upon the rationale of *Urie v. Thompson,*[28] in which the United States Supreme Court developed the "discovery rule."[29] *Urie* involved a locomotive fireman who contracted silicosis from inhaling silica dust over a thirty-year period. The defendant argued that the action was barred by the three-year statute of limitations prescribed in the Federal Employers' Liability Act (FELA). Holding that the cause of action did not accrue until the plaintiff either knew or had reason to know of the disease, the Court said that the adoption of any other rule

> would mean that at some past moment in time, unknown and inherently unknowable even in retrospect, Urie was charged with knowledge of the slow and tragic disintegration of the lungs; under this view Urie's failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded on his consciousness would constitute a waiver of his right to compensation at the ultimate day of discovery and disability.[30]

As observed by the Kentucky Supreme Court, the "thrust of *Urie* is that when an injury does not manifest itself immediately the cause of action should accrue not when the injury was initially inflicted, but when the plaintiff knew or should have known that he had been injured by the conduct of the tortfeasor."[31] Accordingly, an action accrues "only at the time the plaintiff suffers an actionable wrong" or, said another way, an action "does not exist until the conduct causes injury that produces loss or damage."[32] However, a plaintiff's lack of

beginning of the applicable limitations period.

> (4) Federally required commencement date.
> (A) In general. Except as provided in subparagraph (B), the term "federally required commencement date" means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) were caused or contributed to by the hazardous substance or pollutant or contaminant concerned.

26. Ky., 580 S.W.2d 497 (1979).

27. *Id.* at 498, 501.

28. 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).

29. *Louisville Trust Co., supra,* n. 26, at 499.

30. *Id., quoting Urie, supra,* n. 28, 337 U.S. at 169, 69 S.Ct. at 1024, 93 L.Ed. at 1292.

31. *Id.* at 500.

32. *Id.* (citation omitted). This rationale was subsequently followed in rejecting prior case law to apply the "discovery rule" to medical

knowledge as to the extent of his injury does not toll a statute of limitations to which the discovery rule is applied.[33] Recently, the Kentucky Supreme Court upheld the validity of the "discovery rule" in the context of a FELA action, commenting that it has been "further modified to hold that a cause of action accrues when a plaintiff knows or, in the exercise of reasonable diligence, should know of both the injury and its cause."[34]

Although common sense, logic and policy considerations weigh in favor of applying the "discovery rule" in the present context, our research has not revealed nor have we been cited to any Kentucky case applying the "discovery rule" in a property damage action. The United States District Court for the Western District of Kentucky spoke directly to this issue in *G & K Dairy v. Princeton Electric Plant Board*,[35] in which a dairy alleged that Princeton, a distributor of electricity, was negligent in allowing stray voltage to injure its herd of dairy cattle. The dairy argued that its action was timely because it was filed within one year of the discovery that the dairy herd's injuries were caused by stray voltage.[36] The district court disagreed, holding that the "discovery rule" was "not ap-

plicable to [the] property damage action and that, even if it was applicable, it would not change the Court's decision."[37]

According to the district court, when the Kentucky General Assembly has intended for the "discovery rule" to apply in a specific context, it has enacted an applicable statute, with examples including KRS 342.316(3) (workers' compensation actions), KRS 413.245 (professional service malpractice actions) and KRS 413.130(3) (fraud actions).[38] Further, "the same statute which established the one-year limitation for an action for injuries to cattle or livestock by a corporation codified the "discovery rule" for medical malpractice actions and actions for recovery of stolen property. KRS 413.140(1)(b),(2),(4) and (5)."[39] Also, as explained by the district court, "in the absence of a controlling Kentucky statute, no Kentucky court or any federal court construing Kentucky law has held that the 'discovery rule' applies to property damage actions," although the Sixth Circuit Court of Appeals, construing Kentucky law, has applied the "discovery rule" in the context of a personal injury action, albeit "[i]n dicta."[40] Because the action at issue involved property damage rather than personal injury, the district

malpractice actions. "An action for medical malpractice accrues, and begins the running of the limitations period 'on the date of the discovery of the injury, or from the date it should, in light of ordinary care and diligence, have been discovered.'" (Citation omitted.)

33. *Id.*

34. *Lipsteuer v. CSX Transportation, Inc.,* Ky., 37 S.W.3d 732, 737 (2000).

35. 781 F.Supp. 485 (W.D.Ky.1991).

36. *Id.* at 487.

37. *Id.*

38. *Id.* at 488.

39. *Id.*

40. *Id.* In *Drake v. B.F. Goodrich Co.,* 782 F.2d 638 (6th Cir.1986), the United States Court of Appeals for the Sixth Circuit held that KRS 413.140(1) "begins to run from the date 'the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct.'" *Id.* at 641, *quoting Louisville Trust Co., supra,* n. 26, at 501. *See also Kowalski v. Goodyear Tire & Rubber Co.,* 841 F.Supp. 104 (W.D.N.Y.1994), for another case applying the federally required commencement date of 42 U.S.C. § 9658 in a personal injury action.

court deemed this precedent unpersuasive.[41]

As a final basis for its reasoning, the court noted that *Louisville Trust Co.*[42] stands for the proposition that when an injury does not manifest itself immediately the cause of action should accrue not when the injury was initially inflicted, but when the plaintiff knew or should have known that he had been injured by the conduct of the tortfeasor because an "injured party should be allowed to have his day in court when his injury was of an inherently unknowable nature."[43] Because the dairy had learned that stray voltage endangered its herd in April 1987 and became aware of the herd's injuries in the spring of 1988,[44] the court determined that the herd's injuries were not "latent."

In the alternative, the dairy asserted that its complaint was filed timely "because the limitations time does not begin to run or is tolled on a 'continuing wrong,' until the wrong is 'over and done with.'"[45] Again, the district court was unpersuaded by the dairy's argument. Citing *Lynn Mining Co.*[46] and *Fergerson,*[47] the court emphasized that when the discovery rule is inapplicable, an action for an injury which occurred outside the limitations period is time-barred and, even in the case of a temporary nuisance, damages can not be recovered for so much of the injury as occurred outside of the requisite time frame preceding the commencement of the action as measured by the applicable limitations period.[48] Guided by these princi-

ples, the district court engaged in the following analysis:

> *Lynn Mining Co.* and *Fergerson* are analogous to this action. The plaintiffs allege that stray voltage injured their dairy herd. Essentially, this is a "trespass" to the dairy herd. So, even assuming that the dairy herd's exposure to stray voltage was continuous, the plaintiffs' recovery is limited to damages for the injuries inflicted on the dairy herd during the one-year period immediately preceding the commencement of this action on September 8, 1989. Accordingly, the Court will grant summary judgment to the defendant on the plaintiffs' claims for injuries inflicted on their dairy herd prior to September 8, 1988, and deny summary judgment on the plaintiffs' claims for injuries inflicted on their dairy herd on or after September 8, 1988.[49]

In an analogous case, the Iowa Supreme Court adopted the same approach, concluding that injuries resulting from stray voltage are recurring and, therefore, permitted the plaintiff dairy farm owners to recover for damages occurring within the five-year period (the applicable statute of limitations) immediately preceding the inception of their lawsuit against the electric company.[50] "Iowa courts have long followed the principle that a cause of action based on negligence does not accrue until the plaintiff has in fact discovered that he or she has suffered injury or by the exer-

**41.** *Id.*

**42.** *Supra,* n. 26.

**43.** *Id.* (Citation omitted.) *G & K Dairy, supra,* n. 35, at 488.

**44.** The plaintiffs filed their complaint on September 8, 1989.

**45.** *G & K Dairy, supra,* n. 35, at 488.

**46.** *Supra,* n. 17.

**47.** *Supra,* n. 9.

**48.** *G & K Dairy, supra,* n. 35, at 488.

**49.** *Id.*

**50.** *Hegg v. Hawkeye Tri–County REC,* 512 N.W.2d 558 (Iowa 1994).

cise of reasonable diligence should have discovered it."[51] Noticeably absent from the Iowa court's opinion, however, is any discussion as to whether the "discovery rule" should apply in the context of an action based on injury to real property. The Court makes no distinction on this basis, instead applying the rule as it would in any other negligence action without further explanation. Also noteworthy is the Court's declaration that "where the wrongful act is continuous or repeated, so that separate and successive actions for damages arise, the statute of limitations runs as to these latter actions at the date of their accrual, not from the date of the first wrong in the series," which implicitly emphasizes the importance of the accrual date.[52] Acknowledging that the "case comes down to whether the Heggs complained of a continuing wrong," the Court limited the plaintiffs' recovery to those actions accruing during the statutory period of five years preceding the inception of the current action for damages consistent with prior case law from its jurisdiction and the outcome reached in *G & K Dairy*.[53]

In contrast, Wisconsin has held that "if any act of negligence within the continuum falls within the period during which the suit may be brought, the plaintiff . . . may bring suit for the consequences of the entire course of conduct,"[54] a position which is both intuitive and particularly appropriate on the current facts. Further support for this viewpoint is found in *Tucker v. Southern Wood Piedmont Co.*,[55] in which the United States Court of Appeals for the Eleventh Circuit addressed the interplay between the Georgia statute of limitations and the federally mandated "discovery rule." In *Tucker*, the plaintiffs had asserted federal and state causes of action for negligence, trespass and nuisance against the defendant wood treatment companies for exposure to hazardous substances.[56] On appeal, the Circuit Court upheld the decision of the United States District Court for the Middle District of Georgia denying the defendants' motion to restrict the state law claims to injuries that occurred during the four years immediately preceding the filing of the action.[57]

Distinguishing between tort claims for damage to property and actions to recover damages for personal injury, the Court began its analysis by noting that there is no state "discovery rule" in Georgia for torts involving property damage. Rather, "tort claims for damage to property accrue, and the statute of limitations begins running, on the date the wrong is committed, regardless of when the injured party should have discovered the wrongdoing."[58] Because operation of the wood-treating facility ceased more than five years before the subject action was filed, application of the Georgia accrual rule along with the applicable statute of limitations would operate to bar the plaintiffs' cause of action.[59]

51. *Id.* at 559.

52. *Id.*

53. *Id.* at 560.

54. *Id., quoting Kolpin v. Pioneer Power & Light Co.*, 162 Wis.2d 1, 469 N.W.2d 595, 605 (1991).

55. 28 F.3d 1089 (11th Cir.1994).

56. *Id.* at 1090.

57. *Id.* at 1089. Ordinarily, claims for negligence, trespass and nuisance are governed by a four-year statute of limitations pertaining to trespass and damage to realty under Georgia law. *Id.* at 1090.

58. *Id.*

59. *Id.* at 1091.

In the Court's view, however, two considerations complicated matters:

> The first is the "continuing tort" doctrine. Under Georgia law, a cause of action for a tort that is continuing in nature—for example, the frequent run-off of contaminated water across land, or (as in the present case) the underground leakage of hazardous waste onto adjoining property—accrues at the time of continuance. Therefore, the plaintiff in a continuing tort suit can recover for any damages that were suffered within four years prior to the filing of the suit. In the present posture of this case, it is clear that, under Georgia's continuing tort doctrine, plaintiffs would be entitled to any damages that they can prove to have been caused by leakage of hazardous waste onto their property from and after September 6, 1987—four years prior to the date the instant action was filed. Defendants do not argue otherwise.

> The second complicating factor involves the development of federal law in the environmental tort arena. In 1986, Congress amended [CERCLA], in part to address what was perceived as the inadequacy of the laws of some states in dealing with the delayed discovery of the effect of toxic substance pollution.[60]

After setting forth the relevant provisions of 42 U.S.C. § 9658, the Eleventh Circuit Court of Appeals acknowledged the existence of a federally mandated "discovery rule" for environmental tort actions brought under state law, despite the fact that Georgia (like Kentucky), generally does not provide such a rule for torts involving property damage.[61]

According to the defendants, however, 42 U.S.C. § 9658 had no application to the action at issue as statutes of limitation have two independent functions: (1) to define when an action may be brought, and (2) to define the period for which damages can be recovered.[62] Since, in the defendants' view, 42 U.S.C. § 309 applied only to the former function, Georgia law regarding continuing torts was unaffected by the CERCLA amendment relating to the commencement date of state statutes of limitation.[63] In rejecting this argument which parallels that implicitly made by Rockwell, the Court engaged in the following analysis, which is equally applicable here:

> The defendants' argument fails because its central premise is unsound. A statute of limitations does not define, as an independent function, the period for which damages can be recovered. Rather, in the context of a continuing tort, the limitation of the time period for which damages can be recovered operates as part and parcel of limiting when an action can be brought.... Plaintiffs can recover for damages caused by the tort that was committed on September 6, 1987, because they filed suit within the statute of limitations. Without a discovery rule, plaintiffs could not recover for damages caused by the tort that was committed on September 5, 1987, because they filed suit four years and one day after the commission of that tort. That is only true, however, if the statute of limitations for the September 5, 1987, tort began to run on the date the tort was committed, regardless of when plaintiffs discovered or should have discovered the tort. While the date of the wrong is the date the statute

---

**60.** *Id.* (citations omitted).

**61.** *Id.*

**62.** *Id.*

**63.** *Id.*

of limitations begins to run for property damage torts under Georgia law, the analysis is fundamentally altered by the introduction of the federally mandated discovery rule. As long as plaintiffs sued within four years of the time they discovered or should have discovered the wrongs of which they complain, their recovery will not be limited to the four years immediately preceding the filing of the lawsuit.[64]

As the Eleventh Circuit Court of Appeals observed, none of the cases cited by the defendants supported their "dual function" argument regarding the statute of limitations but, rather, applied the continuing tort doctrine without considering the possible effect of a discovery rule, did not address the impact that such a rule would have on continuing torts or applied the discovery rule in the "common-sense" manner described above.[65] Although the defendants contended that the construction adopted by the Court would render 42 U.S.C. § 9658(a)(2) meaningless, the Court found that the "dual function" concept was "unsupported by both logic and case law," citing the legislative history of the amendment as further support for its conclusion.[66] Finally, the Court agreed with the district court's rationale that adoption of the defendants' argument would run counter to the purpose of the relevant provisions of CERCLA and its amendments, which was "to deal with the inadequacies of many state tort systems regarding the delayed discovery of the effect of a release of a toxic substance."[67]

In concluding that "policy, precedent and logic" dictated rejection of the defen-

dants' argument, the Court adopted the district court's reasoning which we find persuasive:

> To conclude that the statute of limitations is tolled until the injury is discovered, but that plaintiffs may only recover for damage done to their property within the immediately preceding period of the statute of limitations[,] is illogical. No purpose is served by tolling the statute of limitations but limiting the damages that may be recovered from the tortfeasor. Such a result would still result in depriving plaintiffs of their day in court for the full extent of their injury.... If the court were to accept defendants' construction of [42 U.S.C.] § 9658, there would be no effective preemption of state statutes of limitation. Quite the contrary, Defendants' reading of § 9658 would simply allow the commencement of an action at any time but limit the period of recovery to that of the statute of limitations.[68]

■ In the absence of binding contrary authority and consistent with the foregoing, we extend the application of the federal "discovery rule" to property damage actions in Kentucky with the necessary implication being that the landowners, if they have a viable cause of action, are entitled to recover damages for injuries incurred outside of the five-year limitation period preceding the filing of their complaint.

The remaining question is what effect, if any, this determination has on the landowners' right to recover punitive damages. The short answer is that wrongdoing oc-

**64.** *Id.*

**65.** *Id.* at 1092.

**66.** *Id.* According to the legislative history, the amendment was meant to address "when the statute of limitations begins to run rather than

the number of years it runs." (Citation omitted.)

**67.** *Id.* at 1093.

**68.** *Id.* at 1093.

curring outside the limitations period is properly considered when assessing punitive damages.[69]

## II. Negligent Trespass

In our initial opinion we determined that the landowners had failed to present evidence from which a jury could determine damages. In other words, there was no admissible evidence from which a jury could assess the fair market value of the landowners' properties after PCBs were deposited on the properties. Rockwell also argued—although we did not decide the issue—that the landowners had failed to demonstrate an actual physical injury to their land. In its supplemental brief following remand by the Supreme Court to this Court Rockwell argues that:

> "Injury" and "damages" are two entirely separate elements of a cause of action, each of which must be established. As the Indiana Supreme Court has explained:
>
>> There is a material distinction between damages and injury.... The words are sometimes used as synonymous terms, but they are, in strictness, words of widely different meaning.... In every valid cause of action two elements must be present, the injury and the damages. The one is the legal harm which is to be redressed (the injury); the other the scale or measure of recovery.[70]

The Kentucky Supreme Court addressed both the injury and the damage components of the landowners' claims:

> [The landowners] presented evidence that PCBs were designated by Congress as hazardous in 1976 and that the EPA [the United States Environmental Protection Agency] has determined that concentrations in excess of 50 parts per million[71] present[ ] an "unreasonable risk of injury to health within the United States." [ ] There was evidence that under Kentucky law PCBs are classified as a "hazardous substance" and that the Kentucky Natural Resources and Environmental Protection Cabinet prevailed in litigation to require Rockwell to remediate property subject to flooding along Town Branch.[72] Evidence was presented that PCBs were present on the landowners' properties, that PCBs were dangerous and carcinogenic, that the properties should be tested and that the presence of PCB contamination affects the fair market value of real property and impairs its value as collateral.[73]

In its discussion of damages, the Supreme Court was referring to the testimony of Trent Spurlock, a Logan County bank officer who testified that before his bank would loan money against a property possibly contaminated with PCBs, it would require that the property be tested at the owner's expense in order to determine the precise amount of contamination, if any. He testified that the presence of any amount of PCBs was not in and of itself

---

**69.** *Cf. Fisher v. Space of Pensacola, Inc.,* 483 So.2d 392 (Ala.1986).

**70.** Rockwell's Supplemental Brief, *citing City of North Vernon v. Voegler,* 103 Ind. 314, 2 N.E. 821, 824 (1885).

**71.** There was no evidence that the PCB level on any landowner's property was anywhere near the federal standard; in fact, no proper-

ty revealed a concentration greater than 2.0 parts per million.

**72.** *See Rockwell International Corp. v. Commonwealth, Natural Resources and Environmental Protection Cabinet,* Ky.App., 16 S.W.3d 316 (1999), discretionary review denied (2000).

**73.** *Wilhite, supra,* n. 4, at 520–521.

fatal to the ability of the landowner to secure a loan; rather, he stated that if the test revealed a quantity of PCBs in excess of an acceptable maximum amount, then the land would have to be remediated before the bank would lend against the property.

The other testimony offered by the landowners to support a calculation of damages came from Bowling Green attorney Steve Hixson who opined that future remediation liability could be imposed on the landowners. The admissibility of his testimony was challenged by Rockwell which argued that it amounted to an improper expert opinion on a question of law. According to Rockwell, such a question was one for the circuit court to decide, not the jury.

The landowners insist that the Supreme Court's opinion in this case stands for the proposition that once *any* detectable quantity of PCBs, no matter how minute, is discovered on a piece of land, that mere presence provides proof of injury to the land required to support a claim for damages. This interpretation is noteworthy because prior to this decision, the question of what amount of contamination would give rise to an actual injury in a negligent trespass case such as this remained undecided in Kentucky law.[74] The United

States District Court for the Western District of Kentucky attempted to predict how the Kentucky Supreme Court would rule when faced with the issue; however, its prediction was different from what the landowners would have us believe.

The case of *Mercer v. Rockwell International Corp.*[75] is similar to the present case in that it was an action filed by a group of landowners farther downstream from Rockwell's facility than those presently before this Court who alleged that Rockwell's negligent discharge of PCBs contaminated their land. The District Court was faced with the issue of what must be proved under Kentucky law in order for a plaintiff to prevail in a trespass case. The Court began its analysis by noting that:

■ Kentucky law allows recovery under trespass in either of three instances: (1) the defendant was engaged in an extra-hazardous activity, (2) the defendant committed an intentional trespass or (3) the defendant committed a negligent trespass.[76] The Court has not discovered any Kentucky case stating the "elements" of a negligent trespass theory. However, Kentucky would follow the *Restatement (Second) of Torts* § 165 as do numerous other jurisdictions.[77]

**74.** There has been ample discussion of *Chapman v. Beaver Dam Coal Company*, Ky., 327 S.W.2d 397 (1959); however, that case is not instructive. In *Chapman*, no damage of any kind could be proved to have been visited upon the downstream landowners as a result of rainwater runoff leaving upstream mining operations. This case would be analogous to *Chapman* if Pydraul-contaminated water had run across the landowners' property without depositing PCBs on the floodplain, which no one alleges happened. Likewise, *Ellison v. R & B Contracting, Inc.*, Ky., 32 S.W.3d 66 (2000), is of no assistance because although the Supreme Court did not explicitly so state, the trespass involved was of an intentional nature, not negligent. As explained more fully in our discussion *infra*, the Supreme Court

relied on *Ellison* in this case in its discussion of damages evidence; the Court did not cite *Ellison* in reference to the elements of a trespass case.

**75.** 24 F.Supp.2d 735 (W.D.Ky.1998).

**76.** *See Randall v. Shelton*, Ky., 293 S.W.2d 559 (1956).

**77.** *See, e.g., Karpiak v. Russo*, 450 Pa.Super. 471, 676 A.2d 270 (1996); *Watson v. Brazos Electric Power Coop., Inc.*, 918 S.W.2d 639 (Tex.App.1996); *Fortier v. Flambeau Plastics Co.*, 164 Wis.2d 639, 476 N.W.2d 593 (App. 1991).

The *Restatement (Second) of Torts* § 165 [says that]:

One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest.

The *Restatement* distinguishes intentional trespasses and negligent trespasses by requiring "harm" for negligent trespass.[78] Liability is imposed for intentional trespasses when there is an intrusion, even when it is harmless, and liability is imposed for negligent trespasses only when there has been harm to the property.[79]

Indeed, the plain language of the *Restatement* and its comments would allow this Court to conclude, without any additional explanation, that negligent trespass requires actual harm to the property.[80]

According to the district court, the *Restatement* requires three basic elements for negligent trespass: (1) the defendant must have breached its duty of due care (negligence); (2) the defendant caused a thing to enter the land of the plaintiff, and (3) the thing's presence causes harm to the land.[81] Because the court had already found Rockwell negligent as a matter of law, it then turned its analysis to whether the landowners had demonstrated an entry onto their land which caused harm.

The court provided an excellent analysis of the law of negligent trespass as it has developed in several jurisdictions across the country. We need not reproduce that analysis in its entirety, although it is certainly instructive; rather, its first of two relevant conclusions appear in the following paragraph:

Trespass is designed to protect against interference with exclusive possession, and not just mere entry. When an object can be seen or sensed in some manner, one may even assume that a landowner's right to exclusively possess his property is infringed. When the "thing" that has entered plaintiff's property is imperceptible to ordinary human senses, it does not so obviously infringe upon a landowner's right to exclusive possession. In such cases, only when the substance actually damages the property does it intrude upon the landowner's right to exclusive possession. Therefore, an essential element of [the landowners'] claim is that the PCB's interfere with their right to exclusive possession by causing actual harm to the property.[82]

Once the court determined that actual harm to property is an essential element of recovery for negligent trespass resulting from the deposit of a toxic substance under Kentucky law, it went on to analyze what kind of proof might demonstrate "actual harm." As it had with its earlier analysis, the court drew from cases throughout the country to hold that actual harm refers to

---

**78.** *See Restatement (Second) of Torts* § 165 cmt. b.

**79.** *Id.*

**80.** *Mercer, supra,* n. 75, at 740.

**81.** *Id.*

**82.** *Mercer, supra,* n. 75, at 743. One can draw a further distinction from *Ellison, supra,* n. 74, in that the materials deposited in *Ellison* were large amounts of construction debris easily noticed by unaided human senses.

a physical injury to the property. In a case of PCB contamination of land, the contamination had to be in a sufficient concentration to pose a health hazard in order to cause a permanent physical injury to the property.[83]

The Kentucky Supreme Court said that in this case, the landowners presented some evidence of an injury to their property. However, the only actual "injury" the landowners demonstrated was the mere presence of PCBs, not any hazard resulting therefrom. There was scientific evidence presented by the landowners that PCBs present a health hazard at higher concentrations, but none demonstrating that a hazard is presented by PCBs in the concentrations found on the land in question. Finally, "[d]ecreased fair market value is not harm to the property, it is only a means of measuring the harm."[84]

We did not decide in our initial opinion whether the minimal presence of PCBs amounts to "actual harm" for purposes of Kentucky law regarding negligent trespass. Likewise, the Supreme Court's opinion only pointed to the existence of the landowners' evidence, not its significance or relationship to an undecided element of the law of trespass. Therefore, our present task is to decide if evidence of a minimal presence of PCBs, in an amount insufficient to present a health hazard, amounts to an actual injury justifying an award of damages.

Were we to accept the landowners' argument that such evidence is sufficient, the implication for future cases would be that in any negligent trespass case, the mere deposit of a potentially toxic substance on property in an amount not detectable by unassisted human senses would satisfy the element of actual injury to the property. Such a decision would open the proverbial floodgates of litigation, allowing a suit to proceed any time a landowner can show the presence, however minute, of a substance known to be harmful in greater concentrations. Given that there was testimony presented that PCBs are present in miniscule amounts on nearly every piece of property wherever located, and that after a century and a half of industrialization there is most likely no land in the continental United States that is completely free from one or more potentially toxic or harmful substances, the landowners would have us authorize a suit by any landowner in the Commonwealth against any individual or enterprise which has ever emitted a potentially harmful substance that can be detected on real property in any amount.

We do not think the Supreme Court intended to make such a sweeping decision. The Court points in its opinion only to the existence of the landowners' proffered evidence, and directs us to analyze it under the challenge originally presented by Rockwell, but not reached in our initial opinion. Further, the Court's reliance on *Ellison,* after quoting our earlier language regarding the necessity for the landowners to prove actual harm, was directed solely at the question of whether the landowners proved damages. The Court said: "This Court recently confronted real property *damages* issues in *Ellison v. R & B Contracting, Inc.*"[85] Such an analysis presupposes satisfaction of the actual harm element of negligent trespass.

As the Supreme Court explained in *Wood v. Wyeth–Ayerst Laboratories,*[86] it would be unrealistic for us to assume that

---

83. *Id.* at 743–745.

84. *Id.* at 743.

85. *Wilhite, supra,* n. 4, at 521 (footnote renumbered).

86. Ky., 82 S.W.3d 849, 855 (2002).

the Court intended to depart from the view espoused by the *Restatement* and the courts of nearly every state to pass on this issue without mentioning such an intention. Likewise, it defies logic to suppose that the Court would make such a sweeping change to Kentucky tort law without any suggestion that it was so doing.[87] Had the Supreme Court intended in this case to make such a dramatic and sweeping change to Kentucky tort law, it would have explicitly said so and provided a thorough explanation of its reasoning. Indeed, the Supreme Court has recently taken great pains to clarify areas of the law it considered in need thereof.[88]

Furthermore, a review of *Wood* provides considerable insight into how the Supreme Court would have us analyze the evidence in this case. In that case, Ms. Wood was seeking compensation for her exposure to the drug fenfluramine after having opted out of the Nationwide Class Action Settlement Agreement entered into between American Home Products Corporation (AHPC), of which Wyeth–Ayerst is a division, and users of its diet drugs Pondimin and Redux. In describing the attempted class action litigation, the Court said:

> In her complaint, [Wood], on behalf of a proposed class, seeks the following relief: (1) court-supervised notice and medical monitoring to enable people who have ingested Fen–Phen to be monitored for the existence of potentially dangerous side effects caused by the drugs, including, but not limited to, valvular heart disease, primary pulmonary hypertension, and for altered serotonin levels and associated cognitive and/or neurophysiological manifestations of impairment or injury; (2) a fund to pay for such monitoring and also medical research concerning the effects of the drugs; (3) reimbursement of the costs of the drugs and/or previously incurred examination costs; and (4) punitive damages.

> \* \* \*

> The trial court dismissed [Wood's] complaint for failure to state a claim upon which relief can be granted, pursuant to [Kentucky Rules of Civil procedure (CR)] 12.02. [ ] The trial court concluded that Kentucky law requires a plaintiff to prove some present physical injury to support a tort claim, and [Wood] had proven no such injury. The Court of Appeals upheld the trial court's decision dismissing the case, also finding that [Wood] did not allege in her complaint any "present physical harm as a result of her ingestion of Fen–Phen." [Wood] then petitioned [the Supreme Court] for review. There being recent developments in toxic tort litigation in other states, we granted discretionary review to address the important issues raised by [Wood] regarding prospective relief for past exposure.

> [Wood's] complaint specifies as her injury, and that of the class she seeks to represent, "significantly increased risk of serious injury and disease." She further claims that she and others will "probably ... be required to pay sums to ascertain the existence, nature and extent of their injuries in the future." In support of her claim, [Wood] cites to many articles from various medical jour-

---

87. *Id.*

88. *See, e.g., Yanero v. Davis,* Ky., 65 S.W.3d 510 (2001) (clarifying the interrelationships between sovereign, governmental and official immunities); *Fraser v. Commonwealth,* Ky., 59 S.W.3d 448 (2001) (standards for relief pursuant to Ky. R.Crim. P. (RCr) 11.42); and *Thompson v. Commonwealth,* Ky., 56 S.W.3d 406 (2001) (dealing with when a circuit court is required to have a hearing to determine a defendant's competency to stand trial).

nals in which experts have recommended ongoing diagnostic testing for people who took fenfluramine. Notwithstanding these expert opinions, recovery on a theory of tort, like negligence or strict liability as sought here, requires a plaintiff to show some present physical injury to support a cause of action. [Wood] has offered no proof that she suffers from any injury at the present time resulting from her contact with or ingestion of fenfluramine. As such, [Wood] has failed to state a claim upon which relief can be granted and her cause of action has not accrued. We therefore affirm the Court of Appeals in dismissing the complaint.[89]

While it is true that *Wood* differs from this case in that it involved alleged injury to a person rather than to property, this distinction actually strengthens its applicability to this case. In *Wood,* the Court required that a plaintiff sustain an actual physical injury to her person, rather than mere exposure to a potentially toxic substance, before it would allow recovery. In the present case, the presence of PCBs currently on the land can be likened to Wood's already-ingested fenfluramine; although the land has been exposed to a substance, PCBs, no present injury to the land has been shown. In contrast, the landowners' theory that the presence of PCBs in itself should be recognized as an injury is analogous to Wood's position regarding her having ingested a potentially harmful or toxic substance (*i.e.,* its mere presence in her body), a theory rejected by the Supreme Court. Were we to adopt the landowners' argument, it would result in an allowance of recovery for alleged injury to property in instances in which individuals who have ingested a toxic sub-

stance may not recover. We are unwilling to conclude, absent express direction, that the Supreme Court intends to provide a right to recover damages for the deposit of any amount of a toxic substance on the lands of the Commonwealth while denying its citizens who ingest or are exposed to a toxic substance a similar right.

Indeed, in a lengthy analysis, the Supreme Court expressed grave policy concerns about allowing prospective awards for medical monitoring. Unfortunate as it may be, the harsh reality of life in the present day is that thousands, if not millions of people, have been exposed to and/or ingested potentially harmful or toxic substances. The Court was concerned about the seemingly limitless litigation that would ensue if it allowed such recovery, concluding that it "is not prepared to part ways with the system of remedies in favor of cash advances as proposed by [Wood]."[90] Likewise, given the widespread potential contamination of land in the Commonwealth and throughout the nation, we are similarly unwilling to abandon the established system of remedies in favor of cash advances as proposed by the landowners.

Further supporting our conclusion is the fact that the testimony offered by the landowners' proffered expert, attorney Stephen Hixson, regarding potential future liability for remediation of their land, was inadmissible. Hixson testified that under Kentucky and federal law, the presence of PCBs on the land creates future liability for the landowners. However, this testimony regarding a legal conclusion is improper, for witnesses—whether of a lay or expert variety, "are not qualified to ex-

89. *Wood, supra,* n. 86, at 851–852. *See also Capital Holding Corp. v. Bailey,* Ky., 873 S.W.2d 187, 195 (1994).

90. *Id.* at 855.

press opinions as to matters of law."[91] It is not the province of witnesses to inform the jury regarding questions of law; that is the function of the judge.[92] Accordingly, it was improper for the trial court to permit the jury to consider any possible liability as testified to by Hixson.

Aside from its inadmissibility, Hixson's testimony was incorrect as a matter of law. Under KRS 224.01–400(25),

[d]efenses to liability, limitations to liability, and rights to contribution shall be determined in accordance with Sections 107(a) to (d) and 113(f) of [CERCLA], as amended, and the Federal Clean Water Act, as amended.

Under CERCLA, any party found liable for remediation of a contaminated site may bring a contribution action against another responsible party.[93] Thus, in the unlikely event the landowners were to be found liable for remediating their properties, they would have a state and/or federal cause of action against Rockwell to recover any remediation costs assessed against them.

It is undisputed that no landowner has incurred liability based on PCB contamination of his or her land. Indeed, in administrative proceedings Rockwell has been ordered to remediate any of the landowners' properties found, after testing, to contain PCBs in excess of the limit imposed by the Commonwealth.[94] In the event such remediation is ordered, an aggrieved landowner would then have a cause of action against Rockwell for the loss of use and enjoyment of the land during its remediation. However, such cause of action has not yet accrued, and is far too speculative at this point to form a basis for the recovery of damages.

Finally, much was made at oral argument about the landowners' responsibility for future testing of their land. However, the attempt to use testing as a basis for relief fails for two reasons. First, Rockwell has paid for testing on all but three of the affected properties and, as noted above, has been held responsible for remediating the properties. Secondly, the Supreme Court addressed this allegation in *Wood*:

We are mindful of the predicament in which our decision places [Ms. Wood] and others [in this case, the landowners] in similar situations. Those who have ingested fenfluramine [or whose land has been exposed to PCB contamination], but in whom no disease is yet manifest [or whose land presents no present health risk], will be forced to either forego medical evaluations [or testing of their land other than as ordered by the Natural Resources and Environmental Resources Cabinet] or proceed with them at their own cost. Nevertheless, any other outcome would result in inordinate burdens for both the potential victim and the alleged negligent party.

* * *

[ ] For those who pay for their own testing but never find disease [or health risk presented by PCB contamination of their land], we regret the economic expense but suggest that they have paid for a service and received the benefit thereof—in this case, a clean bill of

---

91. Robert G. Lawson, *The Kentucky Evidence Handbook,* § 6.15 at 291 (3d Ed., 2002 supp.).

92. *See, e.g., Nieves–Villanueva v. Soto–Rivera,* 133 F.3d 92 (1st Cir.1997).

93. 42 U.S.C. § 9613(f). Responsible parties are listed in 42 U.S.C. § 9606 and 9607.

94. *See Rockwell v. Commonwealth, Natural Resources and Environmental Protection Cabinet, supra,* n. 72.

health and the accompanying peace of mind.

From a policy standpoint, this outcome should act as a sufficient deterrent to those who would negligently produce and distribute [or, in this case, negligently discharge] harmful substances, for they shall still have to compensate victims for any injury caused. Likewise, recognizing only claims supported by physical injury will prevent the potential flood of litigation stemming from unsubstantiated or fabricated prospective harms, thereby preserving judicial and corporate resources to compensate actual victims who develop injuries in the future.[95]

Although the landowners have established that Rockwell negligently trespassed on their properties when it allowed PCBs originating at its Russellville plant to flow into a stream and thus be deposited as a result of flooding on their properties, and although PCBs are a known carcinogen, the landowners have nevertheless failed to establish that their properties have suffered any injury as a consequence of the trespass. No persons who have come upon the land have been harmed, no farm animals or pets have been sickened, nor have any crops been lost. The land and the buildings thereon continue to be used as they were before the presence of PCBs was discovered. Thus, the landowners cannot recover damages under a negligent trespass theory.

## III. Permanent Nuisance

In addition to claims based on negligent trespass, the landowners sought recovery on the ground that Rockwell, by depositing PCBs on their properties, had created a permanent nuisance. KRS 411.520(1) provides that nuisance actions arising at common law are governed statutorily by KRS 411.500 to 411.570. However, those statutes

> shall not be construed as repealing any of the statutes or common law of the Commonwealth relating to nuisance, nor shall be construed to abridge any other rights or remedies available for personal or property damage, but shall be held and construed as ancillary and supplemental thereto.[96]

A private nuisance can be of a permanent or temporary nature, but may not be both.[97] A permanent nuisance is any private nuisance that cannot be corrected or abated at reasonable expense to the owner and is relatively enduring and not likely to be abated voluntarily or by court order.[98]

> A permanent nuisance shall exist if and only if a defendant's use of property causes unreasonable and substantial annoyance to the occupants of the claimant's property or unreasonably interferes with the use and enjoyment of such property, and thereby causes the fair market value of the claimant's property to be materially reduced.[99]

In this case, the landowners' claims are based upon the creation by Rockwell of a permanent nuisance. Their position, that the conditions created by Rockwell's discharge of PCBs cannot be abated except at an expense greater than the total market value of the land, is directly on point with the requirement of KRS 411.530(1)(a). Likewise, because Rockwell no longer engages in the activities which gave rise to the discharge of PCBs, the landowners'

**95.** *Wood, supra,* n. 86, at 859.

**96.** KRS 411.570.

**97.** KRS 411.520(2).

**98.** KRS 411.530(1)(a) and (b).

**99.** KRS 411.530(2).

grievance is not one which may be remedied by some voluntary or court-ordered action to restrain Rockwell's activities.[100]

In contrast, "[a]ny private nuisance that is not a permanent nuisance shall be a temporary nuisance."[101] "A temporary nuisance shall exist if and only if a defendant's use of property causes unreasonable and substantial annoyance to the occupants of the claimant's property or unreasonably interferes with the use and enjoyment of such property, and thereby causes the value of use or the rental value of the claimant's property to be reduced."[102] In this case, the landowners characterized the injury to their property as permanent, thereby making a temporary nuisance analysis unnecessary.

The determination of a private nuisance is to be done using several factors. However, there is some discrepancy between the statutes and the common law regarding the precise elements to be employed. According to *Louisville Refining Co. v. Mudd*,[103]

> the existence of a nuisance must be ascertained on the basis of two broad factors, neither of which may in any case be the sole test to the exclusion of the other: (1) the reasonableness of the defendant's use of his property, and (2) the gravity of harm to the complainant. Both are to be considered in the light of all the circumstances of the case, including [1] the lawful nature and location of the defendant's business[;] [2] the manner of its operation[;] [3] such importance to the community as it may have[;][104] [4] the kind, volume, time and

duration of the particular annoyance[;] [5] the respective situations of the parties[;] and [6] the character (including applicable zoning) of the locality.

KRS 411.550 presents the illustrative factors to be considered in determining the existence of a private nuisance:

> (1) In determining whether a defendant's use of property constitutes a private nuisance, the ... trier of fact shall consider all relevant facts and circumstances including the following:
>
> (a) The lawful nature of the defendant's use of the property;
>
> (b) The manner in which the defendant has used the property;
>
> (c) The importance of the defendant's use of the property to the community;
>
> (d) The influence of the defendant's use of property to the growth and prosperity of the community;
>
> (e) The kind, volume, and duration of the annoyance or interference with the use and enjoyment of claimant's property caused by the defendant's use of property;
>
> (f) The respective situations of the defendant and claimant;
>
> (g) The character of the area in which the defendant's property is located, including, but not limited to, all applicable statutes, laws, or regulations.
>
> (2) A defendant's use of property shall be considered as a substantial annoyance or interference with the use and enjoyment of a claimant's property if it would substantially annoy or interfere

---

100. *See* KRS 411.530(1)(b).

101. KRS 411.540(1).

102. KRS 411.550(2).

103. Ky., 339 S.W.2d 181, 186 (1960). *See also Kentland–Elkhorn Coal Co. v. Charles*, Ky., 514 S.W.2d 659, 662 (1974). Model jury

instructions detailing these factors can be found in *George v. Standard Slag Co.*, Ky., 431 S.W.2d 711, 715 (1968).

104. *Kentland–Elkhorn, id.*, lists this factor as "its importance on the growth and prosperity of the community."

with the use and enjoyment of property by a person of ordinary health and normal sensitivities.

Based on these considerations, it is apparent that, in Kentucky, nuisance is primarily concerned with some use of property by a defendant which causes sufficient annoyance to an adjacent property possessor that interferes with the use of the adjacent land to such a degree that its value is materially reduced. Borrowing from our analysis of negligent trespass,[105] in a nuisance case the annoyance and interference with the use of property are the injury, and the reduced market value is the measure of damages.

■ In this case, there is no rational basis for a finding that the discharge of minute quantities of PCBs onto the landowners' properties resulted in any interference with their use and enjoyment of the properties. While it is true that the presence of PCBs on land may cause a reasonable person to stop using that land because of health risks PCBs pose, it is only the case when a significantly higher concentration of PCBs is present. At the concentrations present on the lands in question, a person of ordinary health and sensitivities would experience no interference with his or her use of the property. There is no scientific basis for concluding that these lands should not be used for their ordinary agrarian purposes.[106] Any

annoyance or interference sustained by the landowners here is the result of an irrational fear of PCBs. The law does not allow relief on the basis of an unsubstantiated phobia.[107]

## IV. Punitive Damages—Passion and Prejudice

As has been noted, the jury awarded the landowners compensatory damages in the approximate sum of $7.56 million for the total destruction of their properties and almost 28 times that amount, $210 million, as punitive damages. Rockwell claims that the award must be set aside because it is excessive [108] and was given under the influence of passion and prejudice engendered by the landowners, particularly in their closing arguments to the jury.[109] According to Rockwell:

The record reflects that [the landowners'] counsel repeatedly attempted to prejudice the jury against Rockwell by reminding the jurors that Rockwell had sold the Russellville facility and by harping on the fact that Rockwell is headquartered in California and on the assertedly lavish lifestyles of its employees (as to which, apart from its manifest irrelevance for any proper purpose, there was not a whit of evidence in the record).

Further, the landowners' counsel "gratuitously referred to Rockwell's location in

105. Section II, *supra*.

106. This is not to suggest that all nuisance cases require a scientifically demonstrable health or safety hazard before the alleged nuisance can be said to interfere with the use of a piece of property. Our analysis is limited to those instances, as here, where the substance is imperceptible to ordinary persons. If PCBs created an unpleasant odor or sound, or were otherwise offensive to human senses, such sensory offensiveness could generate the annoyance and interference necessary for a nuisance. *See, e.g., Wilhite, supra*, n. 4.

107. *See Mercer v. Rockwell, supra*, n. 75, at 744 ff. for a comprehensive discussion of why so-called "stigma damages" may not be recovered in a case involving the same defendant, Rockwell, and similarly-situated landowners.

108. *See State Farm Mut. Ins. Co. v. Campbell, supra*, n. 11.

109. *See* Ky. R. Civ. Proc. (CR) 59.01(d).

'Seal Beach, California' three times during . . . summation and once referred to Rockwell's mythical 'golfing buddies' who supposedly live downstream from its facility in Columbus, Ohio." In this same vein, the landowners' other counsel then "took this tactic to a whole new level," referring to Seal Beach six times in less than an hour and unfairly distorting Rockwell's position regarding the significance of the risk posed by the levels of PCBs on the landowners' properties as follows: "We're not worried out in Seal Beach, California, where everybody has got a tan and a $60.00 haircut and life is good." According to Rockwell, "each of those references was calculated to generate maximum prejudice."

In what is characterized by Rockwell as the "classically inflammatory 'send-a-message' speech," the landowners' counsel then "played on the fact that Rockwell had sold its local operations" with the following plea to the jury:

Rockwell came to Logan County, took advantage of the attractive wage scale, as they call it, fouled its nest, fouled its neighbors, and they pulled out. If they were driving a car, it would be a hit and run.

Logan County is yesterday's news to Rockwell. They [sic] won't be back. They just plain don't care.

The plaintiffs [landowners] respectfully ask you to make them care, to render a verdict that will get their attention, to make a statement from the people of Kentucky that they will hear loudly and clearly in Seal Beach, California.

Counsel went on to assert that Rockwell would "be popping champagne corks in Seal Beach, California," in the event that the jury did not impose punitive damages.

Continuing this theme, counsel argued that:

The great American statesman and Christian, William Jennings Bryan, has instructed us on some of the differences between people and corporations.

First, he said there's a difference in the purpose of creation. God made man and placed him upon his footstool to carry out a divine purpose. Man made the corporation as a money-making machine only.

When God made man, he set a limit to his existence, so that if he was a bad man he wouldn't be bad too long. But when the corporation was created, this limit on age was abolished, and now these corporations live for generation after generation.

When God made man, he gave him a soul and he warned him that in the next world he would be held accountable for deeds done in the flesh. When man created the corporation, he couldn't endow that corporation with a soul, so if it escapes punishment here, it need not fear the hereafter.

In conclusion, counsel advised the jury that awarding the requested $210,000,-000.00 [110] in punitive damages to the landowners would serve as a "statement that they will hear clearly in Seal Beach, California." Based on "the grossly inflammatory tactics employed" by landowners' counsel during their summations, Rockwell argues that the jury's verdict was "animated by passion and prejudice" and, therefore, the punitive damages award must be set aside.

■ In Kentucky, it is well established that a jury verdict on a disputed question

---

110. This sum equals the alleged cost of remediating the landowners' property. The trial court properly declined to permit recovery for compensatory damages in excess of the fair market value of the properties.

of fact "may be reviewed and upset where, as in the present case, the amount at first sight appears excessive and to have been rendered as a result of passion or prejudice." [111] More recently, we have employed this guideline in reviewing an award of punitive damages, declining to reverse an allegedly "excessive" award absent proof that the verdict was "reached as a result of extreme passion and prejudice." [112] In so doing, we acknowledged the unique nature of punitive damage awards which are "the product of numerous and sometimes intangible factors" and, therefore, require the jury to make a "qualitative assessment based on a host of facts and circumstances unique to the particular case before it." [113]

Clarifying our function on review, we observed that reasonable persons will differ in determining the amount of exemplary damages, "but so long as the jury's decision is based on competent evidence, *is free of passion or prejudice,* and is appropriately reviewed by the trial judge, the reviewing court has no basis for substituting its opinion in place of the jury's opinion." [114] Put another way, our reluctance to set aside a verdict as being excessive does not preclude us from doing so "where the amount seems disproportionate to the actual damages suffered and it appears the jury may probably have been actuated by sympathy or by bias, prejudice or like unjudicial and improper motive." [115] The common thread among these cases is a determination that the verdict was the result of passion or prejudice as indicated by the excessiveness of the award and/or, as is the case here, the inflammatory nature of the closing arguments in question.

Appeals to bias against out-of-state residents and corporations have historically been condemned by the courts of this Commonwealth. In *Clement Brothers Co. v. Everett,* [116] this state's highest court was confronted with this issue and conclusively resolved any question regarding the impropriety of the type of language at issue:

> The award strikes us as being so high as to suggest the influence of passion and prejudice. Probably the suggestion is not so strong as by itself alone to warrant setting aside the award, but it is strong enough to induce us to look to the record for sources of prejudice. We find them in the closing arguments of appellees' two counsel.

> The arguments appear to have been designed specifically to appeal to and arouse the passions and prejudice of the jury. The appellant company was pictured as a rich, grasping, foreign corporation running ruthlessly roughshod over the poor, honest, long-suffering citizens of Barren County; its attorney as a rich man who would be upset if it were his "mansion" that suffered the blasting damage. Repeated references were made to the appellant's four-million-dollar contract. The jury was asked whether it would let "these people from North Carolina come in here and destroy a good woman's property?" The appellant was compared to a wolf de-

111. *Commonwealth, Dept. of Highways v. Riley,* Ky., 414 S.W.2d 885, 887 (1967) (citation omitted).

112. *Simpson County Steeplechase Ass'n, Inc. v. Roberts,* Ky.App., 898 S.W.2d 523, 528 (1995).

113. *Id., citing TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

114. *Id.* (emphasis supplied).

115. *Field Packing Co. v. Denham,* Ky., 342 S.W.2d 524, 527 (1961).

116. Ky., 414 S.W.2d 576, 577 (1967).

vouring a lamb.... The jurors were told that if they did not give the requested damages the appellees "will have to look at your faces then in their memory." [117]

Identifying the argument as an "obvious source of passion and prejudice" that apparently influenced the jury in fixing damages, the Court emphasized that such arguments had "repeatedly been condemned," citing a string of authority to that effect.[118]

Among the cases cited by the Court was *Southern–Harlan Coal Co. v. Gallaier*,[119] in which both the "rich and powerful corporation" and its counsel were characterized by opposing counsel as "cold-blooded" and "mercenary." Concluding that the corporation's objection to these derogatory references should have been sustained, the Court found that counsel had committed "gross misconduct" in relying upon the fact that the defendant was a rich and powerful corporation.[120] By way of explanation, the Court engaged in the following reasoning which is equally relevant here:

> The rich and poor stand alike before the law. The corporation is entitled to have its cases tried just as the cases of individuals are tried, and there should be no effort to create prejudice against the defendant by the fact that it is a corporation.
> * * *

No effort should be made to enlist the sympathies of the jury for the plaintiff because he is poor. The case should be tried on its merits without reference to the wealth or poverty of the parties. It was manifestly improper to urge the jury to so find their verdict as not to throw the plaintiff "on the hands of charity." [121]

Further support for this position can be found in *Murphy v. Cordle*,[122] in which the Court determined that the appeal by plaintiff's counsel to the jury "to make the rich defendants pay" was "an unwarranted reference to the financial condition of one of the parties intended to inflame the minds of the jury, and was an appeal to class prejudice which is universally condemned." [123] Similarly, the United States Supreme Court has acknowledged the inherent danger in allowing the admission of such evidence, particularly with respect to punitive damage awards:

> Punitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without

117. *Id.*

118. *Id.* at 578.

119. 240 Ky. 106, 41 S.W.2d 661, 663 (1931).

120. *Id.*

121. *Id.*

122. 303 Ky. 229, 197 S.W.2d 242 (1946).

123. *Id. See also City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 757 (6th Cir. 1980).

In *TXO Production Corp.*, the United States Supreme Court declined to address the issue of whether the financial position of the defendant can properly be considered as a factor to be taken into account in assessing punitive damages as TXO had not challenged that aspect of the jury instructions below. However, the Court did agree with TXO that the emphasis on the wealth of the wrongdoer increased the risk that the award may have been influenced by prejudice against large corporations, "a risk that is of special concern when the defendant is a nonresident." *Supra*, n. 113, 509 U.S. at 464, 113 S.Ct. at 2723, 125 L.Ed.2d at 383.

strong local presences.[124] The instant case vividly illustrates the validity of this concern.

 Even if an argument is improper, however, the question remains whether the probability of real prejudice is sufficient to warrant a reversal. In making this determination, each case must be judged on its unique facts.[125] An isolated instance of improper argument, for example, is seldom deemed prejudicial.[126] But, "when it is repeated in colorful variety by an accomplished orator its deadly effect cannot be ignored."[127] Such is the case here.[128]

 The quoted language which generated the current debate was specifically designed to appeal to and arouse the passion and prejudice of the jury, and it is obvious that the arguments achieved their desired effect as this is not a case involving a single, isolated, or inadvertent comment. To the contrary, the closing arguments at issue epitomize conduct that has been explicitly and consistently condemned by both the courts of this Commonwealth and their federal counterparts as evidenced by even a cursory review of the relevant case law.

In short, we are of the opinion that "the statements of counsel were outside the record, and otherwise improper, [were] calculated to inflame the passions and excite the prejudices of the [jurors], and thereby induce them to disregard the evidence, and go to an extreme and unjustifiable length in arriving at a verdict."[129] Because counsel should not introduce extraneous matters before a jury, or by questions or comments, endeavor to discuss unrelated subjects, where there is a reasonable probability that the verdict of the jury has been influenced by such conduct, it must be set aside.[130] Thus, Rockwell would be entitled to have the punitive damages award set aside on this basis even if our resolution of the issues previously addressed did not independently necessitate reversal.[131]

124. *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432, 114 S.Ct. 2331, 2340, 129 L.Ed.2d 336, 349 (1994). In *Oberg*, the Court held that Oregon's denial of judicial review of the size of punitive damage awards violated the Due Process Clause of the Fourteenth Amendment. Although the Court was not forced to reach the question of what standard of review is constitutionally required, it did observe that "there may not be much practical difference" between review that focuses on "passion and prejudice," "gross excessiveness," or whether the verdict "was against the weight of the evidence." *Id.*, 512 U.S. at 433, 114 S.Ct. at 2341, 129 L.Ed.2d at 350.

125. *Stanley v. Ellegood*, Ky., 382 S.W.2d 572, 575 (1964); *City of Cleveland, supra*, n. 123, at 756.

126. *Id.; Murphy, supra*, n. 122, at 244.

127. *Id.*

128. In *Louisville & N.R. Co. v. Smith*, 27 Ky. L. Rptr. 257, 84 S.W. 755 (1905), counsel for Smith referred to the "great wealth of this soulless corporation" during closing argument. The Court deemed such language improper and reversed the judgment on that basis; because the same type of argument was employed here, the same result necessarily follows.

129. *Id.* at 758.

130. *City of Cleveland, supra*, n. 123, at 756.

131. The United States Supreme Court has recently addressed the role of appellate courts in reviewing punitive damage awards and the criteria for assessing whether such awards are unconstitutionally excessive. In *State Farm Mutual Insurance Co. v. Campbell, supra*, n. 11, the Court determined that the award was neither reasonable nor proportionate to the wrong committed and, therefore, constituted an arbitrary deprivation of property. Relevant for present purposes, the Court declined to impose a bright-line ratio which a punitive damage award cannot exceed, but did conclude that "single-digit multipliers are more likely to comport with due

## V. Landowners' Cross-appeal

We will not consider issues initially raised in the landowners' cross-appeal and in an appeal filed by certain landowners whose claims were dismissed prior to trial because our dismissal of the landowners' cross-appeal and the appeal by landowners whose claims were dismissed prior to trial was not challenged in the Supreme Court; thus the dismissal is final. Secondly, we were directed by the Supreme Court only to review the issues raised by Rockwell in its initial appeal but left undecided when we reversed the judgment on the ground that the testimony of the landowners' appraisal witness, Charles Snyder, was inadmissible.

## VI. Conclusion

For the foregoing reasons, the judgment in favor of the landowners against Rockwell International Corporation is reversed.

**ALL CONCUR.**

---

process, while still achieving the State's goals of deterrence and retribution...." Thus, even if we had not resolved the punitive damage issue in favor of Rockwell, the award in question would necessarily be reduced consistent with the dictates of *State Farm*.