*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0438p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WARREN SMITH, GLENDA AND JACK WRAY, RONALD AND DORIS LAMB, RONNIE AND TERESA WRAY, ERNEST RAY AND RUBY ENGLISH, HERMAN L. AND PAULA HENLEY, JEWELL G. AND RUTH WARFORD, JOHN AND ROBIN COLSON, CHARLES R. AND NATILIE M. ROBERTSON, STEVE BARTHOLOMEW, THOMAS FOSTER STONE, BENNY FRANK HEADY, EUGENE AND HELEN HENLEY, LEON AND DEENA HOSKINS, KEN JERRELL, ELAINE I. TILFORD, REDA FEEZOR, THOMAS L. ANDERSON, and WEDA FLOWERS,

　　　　　　　　*Plaintiffs - Appellants,*

　　*v.*

CARBIDE AND CHEMICALS CORP., UNION CARBIDE CORP., MARTIN MARIETTA ENERGY SYSTEM, INC., MARTIN MARIETTA UTILITY SERVICES, INC., LOCKHEED MARTIN UTILITY SERVICES, and LOCKHEED MARTIN ENERGY SYSTEMS, INC.,

　　　　　　　　*Defendants - Appellees.*

No. 04-5323

---

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 97-00003—Joseph H. McKinley, Jr., District Judge.

Argued: March 11, 2005

Decided and Filed: November 2, 2007

Before: MARTIN and GILMAN, Circuit Judges; COHN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Edmund J. Schmidt III, LAW OFFICES OF DAVID RANDOLPH SMITH & EDMUND J. SCHMIDT III, Nashville, Tennessee, for Appellants. Robert E. Tait, VORYS,

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellees. **ON BRIEF:** Edmund J. Schmidt III, David Randolph Smith, LAW OFFICES OF DAVID RANDOLPH SMITH & EDMUND J. SCHMIDT III, Nashville, Tennessee, for Appellants. Robert E. Tait, Gail C. Ford, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, G. Wilson Horde, KRAMER, RAYSON, LEAKE, RODGERS & MORGAN, Knoxville, Tennessee, for Appellees.

-----------------

## OPINION

-----------------

AVERN COHN, District Judge. This is an environmental case. Plaintiffs-Appellants Warren Smith, *et al*. (collectively referred to as Appellants), appeal the district court's grant of summary judgment for Defendants-Appellees Carbide and Chemicals Corp., *et al*. (collectively referred to as Appellees). Appellants brought claims for intentional trespass, permanent private nuisance, and strict liability based on contamination caused by imperceptible particles, claiming harm to their real property. After briefing and oral argument, we determined that Kentucky law was unsettled regarding a claim of intentional trespass. Accordingly, we certified the following questions to the Kentucky Supreme Court:

1. Is proof of actual harm required to state a claim for an intentional trespass?

2. If the plaintiffs can prove a diminution in their property values due to an intentional trespass, do they have a right of recovery under Kentucky law?

The Kentucky Supreme Court answered the first question "No." The answer to the second question, as will be explained, requires that the district court's decision granting summary judgment on Appellants' intentional trespass claim be REVERSED because a factual dispute exists as to whether Appellants suffered actual injury. As to Appellants' nuisance and strict liability claims, we also find that there are genuine issues of material fact and therefore REVERSE the district court's grant of summary judgment on these claims.

## I. BACKGROUND

### A. Factual Background

### 1. The Paducah Gaseous Diffusion Plant

The Paducah Gaseous Diffusion Plant (PGDP) is a government-owned, contractor-operated uranium enrichment facility located in McCracken County, Kentucky, approximately ten miles west of Paducah, on 3,425 acres, 750 of which are within a security fence. Although there is no single exhibit in the record that accurately details the PGDP boundaries or the Appellants' properties in relation to the plant boundaries, there is a schematic which provides a general overview. *See* J.A. at 380.

PGDP is the only operating uranium enrichment facility in the United States.[1] The plant was designed to "enrich" natural and recycled uranium for use in domestic and foreign commercial power reactors. The plant was constructed in the early 1950s and its operations began in 1952. Over its more than 50-year operating lifetime, the plant has enriched more than one million tons of uranium.

-----

[1]Uranium is an element that naturally occurs in the earth and is mined for commercial purposes. Van Nostrand's Scientific Encyclopedia (Glenn D. Considine & Peter H. Kulik eds., 9th ed., vol. 2, 2002).

Defendant-Appellee Carbide and Chemicals Corporation (now Union Carbide Corporation) was the original site contractor and operated the plant for the Atomic Energy Commission from the beginning of operations in 1952 until March 31, 1984. Defendant-Appellee Lockheed Martin Energy Systems, Inc. (formerly Martin Marietta Energy Systems, Inc.) replaced Carbide and Chemicals Corporation as the operating contractor effective April 1, 1984, and continued its operations until June 30, 1993. The Energy Policy Act of 1992 created the United States Enrichment Corporation (USEC), one of the first steps in the process of privatizing the government's uranium enrichment enterprises. On July 1, 1993, USEC leased portions of PGDP from the Department of Energy, assumed responsibility for uranium enrichment activities, and contracted with Defendant-Appellee Lockheed Martin Utility Services, Inc. (formerly Martin Marietta Utility Services, Inc.) for operation and maintenance of enrichment activities. Lockheed Martin Utility Services, Inc. operated the facility between July 1, 1993 and May 17, 1999. USEC assumed direct operation of PGDP in May 1999 and continues to operate the plant today.

## 2. The Uranium Enrichment Process

The process of enriching uranium at PGDP involves conversion of uranium hexafluoride, $UF_6$, to compressed gas, which is in turn fed through a series of diffusion stages. PGDP has more than 1,800 diffusion stages. The diffusion process generates an enriched uranium product.[2] The enrichment process produces air emissions through stack releases, as well as liquid discharges and waste. Release of low levels of radioactive particles is expected during the uranium enrichment operations; in fact, it is specifically permitted and regulated by the federal government. At all relevant times for purposes of this case, PGDP conducted environmental monitoring to detect and measure any releases of radioactive and other non-radioactive materials. Air monitoring stations are located within the PGDP boundaries and off-site. Surface water in the area surrounding the facility is routinely sampled and tested for contaminants. Testing also is performed on sediments, vegetables, deer, and fish for potentially hazardous substances.

## 3. Contamination Caused by PGDP

### a. Groundwater Contamination

In August 1988, a State of Kentucky agency discovered groundwater contamination outside the boundaries of PGDP – specifically, contamination by trichloroethylene (TCE)[3] and technetium-99 (Tc-99)[4] in a plume of groundwater flowing northwest from the facility. Levels of TCE exceeding regulatory limits were detected in a few wells. The Tc-99 concentrations were below proposed regulatory limits. PGDP provided a temporary water supply to residents in the area that might be affected by the groundwater contamination. Residents who actually were affected by contaminated groundwater were provided with a continuing temporary water supply and eventually

---

[2] The entire uranium enrichment process involves increasing the ratio of the abundance of the isotope uranium-235 to that of uranium-238 above that found in natural uranium. McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003).

[3] TCE is a colorless liquid that is commonly used to clean and degrease industrial equipment. It is a mild irritant to the respiratory tract and the skin. Upon human exposure, TCE can concentrate in the respiratory system, heart, liver, kidneys, central nervous system, and skin. J.A. at 325.

[4] Tc-99 is a man-made radioactive substance that came with recycled uranium brought into the plant to be enriched. It has a radioactive half-life of 213,000 years. Tc-99 is highly mobile in groundwater and is readily absorbed throughout the body. J.A. at 325.

the United States Department of Energy provided them with municipal water at no cost.[5]  PGDP routinely sent informational mailings to residents near the plant regarding the contamination and the facility began holding public briefings about the groundwater contamination.

On March 1, 1990, a second plume of TCE groundwater contamination was detected extending northeast from the boundaries of PGDP at an average depth of 75 feet below the surface. PGDP conducted a neighborhood notification survey of all local residents and held public briefings about the newly detected contamination.  In total, approximately 10 billion gallons of contaminated water were spreading off the site as of April 2000, when the United States General Accounting Office (GAO) issued a report regarding the contamination and cleanup efforts.

### b.  Surface Water Contamination

In mid-December 1988, elevated levels of polychlorinated biphenyls (PCBs)[6] were found in fish taken from a drainage ditch on PGDP's site and the nearby Big Bayou Creek.  Seven of 116 fish caught from Big Bayou Creek had PCBs above the Food and Drug Administration's (FDA) "action level" of two parts per million.  The FDA advises that PCBs in fish tissue at two parts per million or above may present a health risk to humans.[7]  The State of Kentucky posted signs advising people to limit consumption of fish caught in the Big Bayou Creek.

### c.  Soil Contamination

Surface soils within and outside the PGDP boundaries were contaminated by water runoff, spills, and buried waste.  Soil samples revealed the presence of, *inter alia*, Tc-99 and PCBs.

### 4.  Investigation and Cleanup Efforts

Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq*., the Department of Energy and the Environmental Protection Agency (EPA) developed an Administrative Consent Order, effective November 23, 1988, that established a schedule to investigate and remediate offsite groundwater contamination.  In 1994, the EPA placed PGDP on its National Priorities List, the Agency's list of contaminated sites designated as highest priority for cleanup.  From 1988 through 1999, the Department of Energy spent about $388 million on efforts to identify and remove contamination in the groundwater, surface water, and soils within and outside PGDP's boundaries.  The April 2000 GAO report estimated the cost of completing the cleanup at $1.3 billion from fiscal year 2000 through fiscal year 2010.

---

[5]PGDP and McCracken County, Kentucky, Disaster and Emergency Services initially provided a water truck as a temporary water supply.  The plant subsequently provided some residences with an interim water supply consisting of a 1,000-gallon water tank connected directly to the residences' plumbing.  Eventually the Department of Energy paid for construction of a pipeline to transport public water from the West McCracken Water District to the residences.  The Environmental Protection Agency notes that approximately one hundred residences and businesses are receiving municipal drinking water from the Department of Energy because of the groundwater contamination.  *See* http://www.epa.gov/region4/waste/fedfac/doepgdp.htm.  Nothing in the record explains whether the municipal water supplied by the Department of Energy is a permanent source of water.

[6]PCB is a heat-resistant oil used in electrical equipment like transformers.

[7]PCBs bioaccumulate in fish, meaning that they build up in the tissue of fish.  J.A. at 1114.

## B. Procedural Background

Appellants are sixteen persons who reside and/or own real property within ten miles of PGDP.[8] They filed suit on January 3, 1997, claiming a diminution of property values based on radiological contamination caused by the operation of PGDP. Appellants concede that they have sustained no physical bodily injuries as a result of Appellees' operations at PGDP. Appellants contend that groundwater and soil contamination constitute an intentional trespass and a permanent private nuisance that has substantially and unreasonably interfered with the use and enjoyment of their property and has decreased their property values. They also claim that Appellees are liable for the contamination under a strict liability theory based on Restatement (Second) of Torts § 519. Appellants also bring an outrage claim against Appellees, arguing that Appellees are liable to them for severe emotional distress they have suffered as a result of Appellees' outrageous conduct.

Appellants moved for class certification. The district court denied the motion. Appellees filed a motion for summary judgment and Appellants filed a motion for partial summary judgment. The district court granted Appellees' motion, denied Appellants' motion, and dismissed the case. Specifically, the district court noted in its decision that the Appellants have adduced evidence to show contamination of their properties by imperceptible radionuclides. The district court also noted that Appellants demonstrated that their property values have suffered as a result. The district court, however, held that Kentucky law requires that Appellants' claims be based on proof that the contamination is at a level that is harmful to their health, something the Appellants could not prove. Accordingly, based on this holding, the district court held that summary judgment was proper with respect to Appellants' claims of (1) intentional trespass, (2) permanent private nuisance, and (3) strict liability. With respect to Appellants' outrage claim, the district court held that Appellants failed to satisfy their burden of proof for purposes of bringing an outrage claim under Kentucky law.[9]

## II. ANALYSIS

### A. Intentional Trespass Claim

As noted above, we certified two questions to the Kentucky Supreme Court. The Kentucky Supreme Court answered the first question of whether proof of actual harm is required to maintain a claim for intentional trespass "No." Thus, it is now settled that Appellants may bring a claim for intentional trespass without proof of actual harm and the district court's contrary conclusion cannot stand. As to the second question, whether a diminution in property values gives Appellants a right of recovery for the intentional trespass, the Kentucky Supreme Court stated that the question "confuses the 'right to recover' with the 'measure of damages' as a substitute for proof of actual harm.'" *Smith v. Carbine and Chem. Corp.*, 226 S.W.3d 52, 55 (2007). In other words, the Kentucky Supreme Court said that the diminution in value is a recognized measure of *damages* which can be used once an "actual injury–an interference with an owner's use of the land," *id.* at 56–has been established. The Kentucky Supreme Court went on to explain what is meant by an "actual injury," and offered the following guidance:

> . . . Property owners are not required to prove contamination that is an actual and verifiable *health* risk, nor are they required to wait until government action is taken. *An intrusion (or encroachment) which is an unreasonable interference with the*

---

[8] The third amended complaint names more than one hundred plaintiffs. The parties, however, agreed to segregate sixteen plaintiffs for purposes of trial. Counsel for Appellants chose eight plaintiffs, and counsel for Appellees chose eight plaintiffs.

[9] The district court's decision regarding Appellants' outrage claim is not a basis for this appeal.

*property owner's possessory use of his/her property is sufficient evidence of actual injury.*

> When the parcel's groundwater is contaminated whether by imperceptible particles or visible particles, to the extent that it cannot be used for consumption by humans, animals, or crops, there is an actual injury. When ponds and streams have to have signs posted to prevent swimming, fishing, drinking, or other otherwise normal uses, there is an unreasonable interference with one's use and enjoyment. *The amount of harm, if any, to the individual parcels, and the corresponding measure of actual or compensatory damages will depend upon the proof introduced at trial–an issue of fact.*

*Id.* at 56-7 (emphasis added).

Following the Kentucky Supreme Court's decision, the parties submitted supplemental briefs. Appellants contend that the record contains evidence of actual injury sufficient to survive summary judgment and require a trial on their intentional trespass claim. We agree. Indeed, while the key inquiry is obviously whether Appellants suffered "actual injury," the emphasized language instructs that this is a factual inquiry *for trial*.

With respect to the record, eight of the 16 Appellants had their water wells capped or have been prevented from digging wells. The Department of Energy has provided all 16 Appellants with free municipal water as a result of the groundwater contamination, and Appellants affirmed that they have stopped raising livestock, gardening, and consuming fish from nearby streams. Appellants also presented an expert report from Bernd Franke, who examined actual radiation monitoring records and prepared a dispersion model. Franke determined the amount of radiation exposure and contamination and concluded that the soil contamination exceeded EPA standards. Appellants also offered affidavits from some of the property owners as to financial harm caused by the contamination, including a diminution in property values, clouds on their title, and the denial of mortgages because of the contamination.

Appellees argue that the record does not contain sufficient evidence that Appellants suffered an actual injury as a matter of law. They do, however, concede that the eight property owners whose property is located above the plumes are potentially impacted. They also take issue with Appellants' expert's conclusions and reports on property values, citing their own expert's conflicting reports. Appellees' interpretation of the record is better directed to a fact finder and does not, in our view, indicate an absence of a genuine issue of material fact as to actual injury.

Thus, Appellants have satisfied their burden of showing a genuine issue of material fact with respect to the issue of actual injury to their properties under Kentucky law. This requires the case to go to trial on their claim of intentional trespass. In so holding, we express no opinion regarding the amount of damages to which Appellants may be entitled.

### B. Nuisance Claim

As to Appellants' nuisance claim, they raise the issue of whether, under Kentucky law, a nuisance claim based on imperceptible particles requires proof of health-threatening contamination. The district court's conclusion that the only way for Appellants to proceed on their negligence claim is to show that Appellees' contamination constituted a health hazard is inconsistent with Kentucky law as interpreted by the Kentucky Supreme Court.

A nuisance is a class of wrong that "arises from the unreasonable, unwarrantable, or unlawful use by a person of his own property and produces such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage." *City of Somerset v. Sears*, 233

S.W.2d 530, 532 (Ky. 1950) (quoting 39 AM. JUR. *Nuisances* § 2). "The essence of a private nuisance is an interference with the use and enjoyment of land. The ownership or rightful possession of land necessarily involves the right not only to the unimpaired condition of the property itself, but also to some reasonable comfort and convenience in its occupation." KEETON, ET AL., § 87 at 619. Under Kentucky law,

> [a] permanent nuisance shall exist if and only if a defendant's use of property causes unreasonable and substantial annoyance to the occupants of the claimant's property or unreasonably interferes with the use and enjoyment of such property, and thereby causes the fair market value of the claimant's property to be materially reduced.

K.R.S. § 411.530(2). The measure of compensatory damages for a permanent nuisance is "the reduction in the fair market value of the claimant's property caused by the nuisance, but not to exceed the fair market value of the property." *Id*. at § 411.560(1). Damages may not, however, be awarded "for annoyance, discomfort, sickness, emotional distress, or similar claims for a private nuisance." *Id*. at § 411.560(3).

The district court adopted the reasoning of *Rockwell Intern. Corp. v. Wilhite*, 143 S.W.3d 604 (2003) in concluding that Kentucky law requires a demonstrable health hazard to recover under a nuisance theory for contamination of real property by imperceptible particles. The *Wilhite* court held that the plaintiffs could not recover on a theory of permanent nuisance because

> [w]hile it is true that the presence of PCBs on land may cause a reasonable person to stop using that land because of health risks PCBs pose, it is only the case when a significantly higher concentration of PCBs is present. At the concentrations present on the lands in question, a person of ordinary health and sensitivities would experience no interference with his or her use of the property. There is no scientific basis for concluding that these lands should not be used for their ordinary agrarian purposes. Any annoyance or interference sustained by the landowners here is the result of an irrational fear of PCBs. The law does not allow relief on the basis of an unsubstantiated phobia.

*Wilhite*, 143 S.W.3d at 627.

Unlike *Wilhite*, Appellants here have not suffered "[a]ny annoyance or interference" based solely on an "irrational fear" of the contaminants. Indeed, as discussed above, they have suffered interference with the enjoyment of their real property in tangible and substantial ways. Perhaps most significant is the fact that some of the Appellants are no longer able to use their water wells and instead must rely on the Department of Energy to provide them with municipal water and the fact that they have been prevented from installing new water wells as a result of the groundwater contamination.

In addition to *Wilhite*, the district court cited three other Kentucky cases for the proposition that Kentucky law requires actual harm to real property in the form of a health hazard for purposes of a nuisance action. The three other cases on which the district court relied, however, are distinguishable from this case.

In *McCaw v. Harrison*, 259 S.W.2d 457 (Ky. 1953), dairy farmers sued to enjoin the defendants from using property adjoining the dairy farm for use as a cemetery. Witnesses for the plaintiff testified that bacteria and germs from the buried bodies contaminated wells and springs in the area and caused a hazard to the plaintiffs' health. *Id*. at 458. The Kentucky Supreme Court held that "if the location or maintenance of a cemetery endangers the public health, either by corrupting the surrounding atmosphere, or water of wells or springs, it constitutes a nuisance." *Id*. at 458. The

*McCaw* court, however, affirmed the lower court's decision that the evidence was insufficient to show that maintaining a cemetery would endanger the plaintiffs' health. *Id.* at 458-59.

In *Morgan v. Hightower*, 163 S.W.2d 21 (Ky. App. 1942), a trespass case, the Kentucky Court of Appeals held that the plaintiff could not recover in a trespass action for damage to the reputation of his property based on a suicide that occurred on the property. 163 S.W.2d at 22. The plaintiff alleged, *inter alia*, diminution in property value based on the suicide because his home was "shunned by the public and its good name and fame have been destroyed. . . ." *Id.* The *Morgan* court held that, absent physical interference with the property, "[s]uch an injury is more imaginary than real, or at most is but sentimental and is not a proper element of damage." *Id.*

In *City of Louisville v. Munro*, 475 S.W.2d 479 (Ky. 1971), property owners brought a nuisance claim against the defendant for diminution of property value based on a city zoo being located next door to the plaintiffs. The Kentucky Supreme Court held that the presence of the zoo was not a nuisance *per se* and that the plaintiffs failed to establish that the zoo disturbed their physical comfort or interfered with the use of their property. *Id.* at 482.

*McCaw*, *Morgan*, and *Munro* did not involve physical invasions of the plaintiffs' properties. Here, however, Appellants have produced evidence showing physical invasion of their properties by virtue of groundwater and soil contamination caused by the Appellees. Thus, the district court's reliance on these cases was misplaced.

Appellees urge us to look to the reasoning in *Lamb v. Martin Marietta Energy Sys., Inc.*, 835 F. Supp. 959 (W.D. Ky. 1993). *Lamb* involved a suit against one of the Appellees in this action for contamination from PGDP. *Id.* at 960. Indeed, *Lamb* resulted from the discovery in August 1988 that groundwater outside PGDP contained contaminants that had affected residential water wells. *Id.* The court in *Lamb* granted the defendant's motion for summary judgment on plaintiffs' property damage claims. *Id.* at 970. Specifically, with respect to plaintiffs' nuisance claim, the *Lamb* court held that any impact of the emissions from PGDP on the plaintiffs' property was *de minimus* and not actionable. *Id.* In support of its holding, the court cited the Restatement (Second) of Torts § 821F, which provides that "[t]here is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose." *Id.* at 969 (quoting RESTATEMENT (SECOND) OF TORTS § 821F). The court also cited a comment to that provision of the Restatement, which illuminates what is required for purposes of establishing "significant harm:"

> By significant harm is meant harm of importance, involving more than slight inconvenience or petty annoyance. The law does not concern itself with trifles, and therefore there must be a real and appreciable invasion of the plaintiff's interests before he can have an action for either a public or a private nuisance.

*Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 821F cmt. c).

The *Lamb* decision, however, is also distinguishable from the instant case. Unlike this case, the plaintiffs in Lamb owned property that was not within the plume of groundwater contamination from PGDP. *Id.* at 961. Additionally, samples taken from the plaintiffs' wells showed no detectable amount of technetium or TCE. *Id.* A geologist affirmed that it would be "extremely unlikely" that the contamination would ever touch the plaintiffs' property. *Id.* at 969. In this case, Appellants' properties are within the area of groundwater contamination. Appellants have had their drinking water wells capped and have been prevented from drilling new wells on their property. Unlike *Lamb*, Appellants here have demonstrated a physical invasion of their property sufficient to, at the very least, create a genuine issue of material fact with respect to whether they have suffered a "real and appreciable invasion" of their interests.

Also instructive is an unpublished decision from this Court, *McGinnis v. Tenn. Gas Pipeline Co.*, 25 F.3d 1049, 1994 WL 234268 **1 (6th Cir. May 31, 1994), which holds that, "[i]n order to establish a nuisance, Kentucky law requires an actual physical interference with or harm to the plaintiff's property." *Id*. at **2. The plaintiff in *McGinnis* owned land adjacent to an industrial tract that was contaminated with PCBs. *Id*. at **1. She alleged that the defendant's release of PCBs contaminated her land, reduced its value, and caused her emotional distress. *Id*. This Court affirmed the district court's grant of summary judgment for the defendant because there was no evidence of PCB contamination on plaintiff's property. *Id*. The Court noted that "Kentucky law requires more than a risk of contamination before plaintiff can prevail in a nuisance action" and that, "[i]n the absence of actual harm to her property, [plaintiff] is not entitled to recover damages." *Id*. at **3. This case fits squarely within the requirements articulated in *McGinnis* to recover for a nuisance. Appellants have done more than merely show a *risk* of contamination; rather, they have demonstrated harm to their property by means of contamination caused by the Appellees.

The district court erred in concluding that Appellants must produce evidence that Appellees' contamination constituted a health hazard to proceed on their permanent private nuisance claim. Furthermore, the record contains a genuine issue of material fact with respect to whether they have suffered a "real and appreciable invasion" of their interests in their real property. In short, Appellants' nuisance claim must go to trial for the same reasons as their intentional trespass claim.

## C. Strict Liability Claim

As to Appellants' strict liability claim, the issue is whether a claim for strict liability for an abnormally dangerous activity under Restatement (Second) of Torts § 519 requires proof of actual harm that rises to the level of a health hazard. Appellants claim that Appellees are strictly liable for the release of radiological waste because such a release is an abnormally dangerous activity under Restatement (Second) of Torts § 519, which provides that "[o]ne who caries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." RESTATEMENT (SECOND) OF TORTS § 519(1).

The district court denied relief for this theory, holding that because Section 519 requires proof of "harm to . . . land," Appellants cannot recover because they cannot demonstrate that the contamination rises to the level of a health hazard. Appellants contest this holding on the same grounds as they contested the district court's holding discussed above with respect to its imposition of an actual harm requirement for Appellants' intentional trespass claim. Because the Kentucky Supreme Court has clarified that an action for intentional trespass based on imperceptible particles does not require a showing of actual harm, this issue need not be explored further. Contrary to what the Appellees urge, Restatement (Second) of Torts § 519 does not state that a claim for strict liability under that section requires proof of *physical harm* to persons or property. Appellants have shown a genuine issue of material fact with respect to harm to their real property that would give rise to a claim of strict liability based on an abnormally dangerous activity under Restatement (Second) of Torts § 519.

## D. Preemption

In the final two paragraphs of Appellees' brief, they say that, to the extent Appellants' claims concern airborne contamination, they are preempted by federal law. Appellees say that they challenged Appellants' claims on two independent bases at the district court level: (1) by way of their motion for summary judgment; and (2) in their motion to exclude Appellants' expert witness testimony as irrelevant because the testimony did not claim that historical Tc-99 emissions exceeded applicable regulatory limits, a requirement Appellees say is a prerequisite to liability under the

federal preemption doctrine. Appellees raised the preemption issue again in their supplemental brief.[10]

This argument is not well taken for two reasons. First, Appellees have not fully develop this preemption argument through substantive legal reasoning. The Appellees appear to have included this argument as an afterthought in their brief because they failed to include any substantive discussion about it. Moreover, Appellees did not address this issue at oral argument. Second, the arguments Appellees raise with respect to preemption apparently were raised in a motion to exclude expert testimony of Appellants' expert witnesses – not in Appellees' motion for summary judgment, which is the final order from which Appellants appeal. When it granted summary judgment for the Appellees, the district court noted in its order that "as a result of this decision, all remaining pending motions are rendered moot." Accordingly, the district court never addressed the arguments raised in Appellees' motion to exclude expert testimony.

We find it improvident for us to consider Appellees' preemption arguments in the first instance. *See White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) ("This court will not decide issues or claims not litigated before the district court."). Rather, on remand, the district court is free to address the preemption argument that Appellees urge us to consider.

### III. CONCLUSION

In the end, the proofs must be put to a jury on whether Appellants suffered harm to their property and are entitled to damages based on their claims of intentional trespass, nuisance, and strict liability. The jury, properly instructed,[11] must decide the outcome.

For the foregoing reasons, we **REVERSE** the decision of the district court and **REMAND** this case for further proceedings consistent with this opinion.

---

[10] Appellants filed a Motion for Leave to File a Supplemental Reply Brief in order to address Appellees' preemption argument. In light of our decision to decline to consider this issue, Appellants' motion is DENIED.

[11] The Kentucky Supreme Court's opinion offers guidance on the proper instructions for an intentional trespass claim. *Smith*, 226 S.W.3d at 56-7.